# EXXON CORP. ET AL. *v.* HUNT, ADMINISTRATOR OF NEW JERSEY SPILL COMPENSATION FUND, ET AL.

No. 84–978.   Argued December 9, 1985—Decided March 10, 1986

356

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 377. POWELL, J., took no part in the consideration or decision of the case.

*Daniel M. Gribbon* argued the cause for appellants. With him on the briefs were *John J. Carlin, Jr.*, and *E. Edward Bruce.*

*Mary C. Jacobson*, Deputy Attorney General of New Jersey, argued the cause for appellees. With her on the brief were *Irwin I. Kimmelman*, Attorney General, and *Michael R. Cole*, First Assistant Attorney General.*

---

*A brief of *amicus curiae* urging reversal was filed for the United States by *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Samuel A. Alito, Jr., Robert L. Klarquist*, and *Dirk N. Snel.*

A brief of *amici curiae* urging affirmance was filed for the State of California et al. by *John K. Van de Kamp*, Attorney General of California, *Theodora Berger*, Assistant Attorney General, *Reed Sato*, Deputy Attorney General, *Joseph I. Lieberman*, Attorney General of Connecticut, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *James E. Tierney*, Attorney General of Maine, *Stephen E. Merrill*, Attorney General of New Hampshire, *Robert Abrams*, Attorney General of New York, *Jim Mattox*,

JUSTICE MARSHALL delivered the opinion of the Court.

The question for our determination is whether § 114(c) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2796, 42 U. S. C. § 9614(c), pre-empts the New Jersey Spill Compensation and Control Act, N. J. Stat. Ann. §§ 58:10–23.11 to 58:10–23.11z (West 1982 and Supp. 1985) (Spill Act). We conclude that the Spill Act is pre-empted in part.

## I

### A

In 1977 the New Jersey Legislature enacted the Spill Act to respond to the problem of hazardous substance release. Finding that oil spills threatened the health and beauty of the State's natural resources, and that leaks of hazardous chemicals from disposal sites presented a great risk to the public, the legislature intended the Spill Act to protect the citizens and environment of New Jersey through prevention and cleanup of spills and other releases. Those efforts are financed by an excise tax levied upon major petroleum and chemical facilities within the State. The money collected goes into a permanent fund known as the "Spill Fund." The Spill Fund may spend money to clean up releases of hazardous substances, to compensate third parties for certain economic losses sustained as a result of such releases, and to pay administrative and research costs. N. J. Stat. Ann. § 58:10–23.11o (West Supp. 1985).[1]

---

Attorney General of Texas, and *Jeffrey L. Amestoy*, Attorney General of Vermont.

[1] The compensation for third-party economic loss is broad. The Spill Fund is strictly liable to any party that suffers direct or indirect economic damage from releases of hazardous substances, including (1) damage to any real or personal property, (2) damage to natural resources, (3) loss of income or earning capacity, in certain circumstances, (4) loss of property tax revenue by the State or a local government for one year following the discharge, and (5) interest incurred on loans to ameliorate the effects of a

In 1980 Congress enacted CERCLA in response to similar concerns. CERCLA imposes an excise tax on petroleum and other specified chemicals. The Act establishes a trust fund, commonly known as "Superfund," 87.5% of which is financed through the excise tax, and the remainder through general revenues. Superfund money may be used to clean up releases of hazardous substances and for certain other purposes.[2] Unlike the Spill Act, CERCLA does not include oil spills within its definition of hazardous substance releases, nor is Superfund money available to compensate private parties for economic harms that result from discharges of hazardous substances. Rather, it seeks to facilitate government cleanup of hazardous waste discharges and prevention

discharge pending reimbursement by the Spill Fund. N. J. Stat. Ann. § 58.10–23.11g (West 1982).

[2] Title 42 U. S. C. § 9611(a) provides:

"The President shall use the money in the Fund for the following purposes:

"(1) payment of governmental response costs incurred pursuant to section 9604 of this title, including costs incurred pursuant to the Intervention on the High Seas Act;

"(2) payment of any claim for necessary response costs incurred by any other person as a result of carrying out the national contingency plan established under section 1321(c) of title 33 and amended by section 9605 of this title: *Provided, however,* That such costs must be approved under said plan and certified by the responsible Federal official;

"(3) payment of any claim authorized by subsection (b) of this section [providing for reimbursement to the Federal and State Governments for damage to natural resources under their respective control] and finally decided pursuant to section 9612 of this title, including those costs set out in subsection 9612(c)(3) of this title [providing for recovery by Fund of interest, costs, and attorney's fees in action against any person liable to the claimant or to the Fund]; and

"(4) payment of costs specified under subsection (c) of this section [providing for research, restoration or replacement of natural resources, prevention of releases, equipment and overhead, and administrative costs].

"The President shall not pay for any administrative costs or expenses out of the Fund unless such costs and expenses are reasonably necessary for and incidental to the implementation of this subchapter."

of future releases. There are two primary purposes for which the Superfund money may be spent—to finance "governmental response," and to pay "claims." See § 111(a) of CERCLA, 42 U. S. C. § 9611(a). Governmental response consists of "removal," or short-term cleanup, § 9601(23), and "remedial action," or measures to achieve a "permanent remedy" to a particular hazardous waste problem, § 9601(24).[3] Claims are demands for reimbursement made upon the Superfund, and also come in two types. One type of claim is a demand by "any other person" for costs incurred pursuant to the federal plan for cleanup of hazardous substances, known as the "national contingency plan." § 9611(a)(2).[4] Thus, Superfund may reimburse private parties only to the extent that their cleanup activities are expressly authorized by the Federal Government. The second type of claim is a demand by the Federal or a State Government for compensation for damages to natural resources belonging to that government. § 9611(a)(3). Superfund money may not be used to pay for injury to persons or property caused by hazardous wastes, except for payment to the Federal and State Governments for their natural resource losses.

This litigation concerns § 114(c) of CERCLA, as set forth in 42 U. S. C. § 9614(c), which provides:

"Except as provided in this chapter, no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated

---

[3] Section 104 of CERCLA, 42 U. S. C. § 9604, which sets out procedures for governmental response to hazardous substance releases, provides that state and local governments, as well as the Federal Government, may be delegated by the President to undertake appropriate measures and receive reimbursement from Superfund. It appears, therefore, that the term "governmental response costs" in § 9611(a)(1), see n. 2, *supra*, refers to Federal, State, and local Government.

[4] Because paragraph (1) of 42 U. S. C. § 9611(a) apparently applies to any governmental entity, see n. 3, *supra*, the phrase "any other person" in paragraph (2) of that subsection must denote any nongovernmental entity.

under this subchapter. Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any person or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a release of hazardous substances which affects such State."

Clearly, this provision is meant to forbid the States to impose taxes to finance certain types of funds. The issue in this case is whether the New Jersey Spill Fund is, in whole or in part, the type of fund that § 114(c) pre-empts.

### B

Appellants are corporations that have paid the Spill Act tax since its inception. After unsuccessful attempts to litigate the issue in the federal courts, see *Exxon Corp.* v. *Hunt*, 683 F. 2d 69 (CA3 1982), cert. denied, 459 U. S. 1104 (1983); cf. *New Jersey* v. *United States*, 16 ERC 1846 (DC 1981) (dismissing suit brought by New Jersey seeking to have tax declared valid),[5] appellants brought suit in the New Jersey Tax Court against New Jersey and certain of its officials (collectively New Jersey), seeking a declaratory judgment and a refund of taxes paid pursuant to the Spill Act. Appellants claimed that the New Jersey tax was invalid in its entirety under § 114(c) and the Supremacy Clause. The Tax Court entered summary judgment for New Jersey on two alternative grounds. First, the court concluded that § 114(c) does not pre-empt state funds that pay cleanup costs and

---

[5] A member of the New Jersey Legislature also brought suit against the United States seeking to have the Spill Act declared valid. The parties settled the litigation, stipulating that New Jersey could spend Spill Fund money for seven enumerated purposes, including compensation for response costs and damages that are eligible for Superfund compensation but are not actually compensated. See *Lesniak* v. *United States*, 17 ERC 1456 (NJ 1982). Appellants, of course, were not parties to that settlement.

other claims that are not actually compensated by Superfund. Second, even accepting appellants' argument that § 114(c) precludes any state taxation of industry to pay for cleanup and remedial activities, the court found that there were sufficient nonpre-empted purposes to the Spill Fund to make the Fund valid in its entirety. 4 N. J. Tax 294 (1982).

The Appellate Division of the New Jersey Superior Court affirmed, 190 N. J. Super. 131, 462 A. 2d 193 (1983), as did the New Jersey Supreme Court, 97 N. J. 526, 481 A. 2d 271 (1984). The latter court, like the Tax Court, concluded that "the Spill Fund tax . . . is not preempted by section 114(c) of Superfund insofar as Spill Fund is used to compensate hazardous-waste cleanup costs and related claims that are either not covered or not actually paid under Superfund." *Id.*, at 544, 481 A. 2d, at 281. We noted probable jurisdiction, 472 U. S. 1015 (1985), and we now affirm in part and reverse in part.[6]

## II

This is an express pre-emption case; appellants claim that the plain language of § 114(c) forbids state taxation of the type the Spill Act imposes. When a federal statute unambiguously precludes certain types of state legislation, we need go no further than the statutory language to determine whether the state statute is pre-empted. *Aloha Airlines, Inc.* v. *Director of Taxation*, 464 U. S. 7, 12 (1983).

---

[6] CERCLA was a temporary experiment; by its terms, the Federal Government's authority to collect the excise tax and to appropriate general revenues for Superfund expired on September 30, 1985. 42 U. S. C. §§ 9653, 9631(b)(2). The Congress is currently considering legislation that would extend CERCLA for another five years. See H. R. 2005, 99th Cong., 1st Sess. (1985), passed by the Senate, see 131 Cong. Rec. 25090–25091 (1985), and H. R. 2817, 99th Cong., 1st Sess. (1985), inserted into H. R. 2005, 99th Cong., 1st Sess. (1985), passed by the House, see 131 Cong. Rec. 35626 (1985). As passed, both the Senate and House bills eliminate § 114(c). See S. 51, § 135; H. R. 2005, § 147. Of course, appellants' claims for a refund of taxes paid through September 30, 1985, are unaffected by the expiration of CERCLA or by any changes in the law after that date.

Section 114(c), unfortunately, is not a model of legislative draftsmanship. The critical language, "no person may be required to contribute to any fund, the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this subchapter," is at best inartful and at worst redundant. As just one example, it is not clear whether "which may be compensated under this subchapter" modifies only the word "claims" which immediately precedes it, or the entire phrase "any costs of response or damages or claims." Because the terms "claims," "response," and "damages" have specific, technical definitions under CERCLA, the way the sentence is parsed may have a significant effect on its meaning. Finally, § 114(c) by itself does not provide a method for determining whether a particular expenditure "may be compensated" by Superfund. That determination, therefore, necessitates reference to the remainder of CERCLA.

### III

Our task, then, must proceed in three parts. First, we must determine what class of expenses is encompassed within the phrase "costs of response or damages or claims." Then, because at least some of those expenses are covered by § 114(c) only to the extent that they "may be compensated" by Superfund, we must determine the meaning of that phrase as well. Finally, if we find an overlap between § 114(c)'s prohibitions and the Spill Act's provisions, we must hold the latter pre-empted.

### A

Both parties agree as to the first question. Each concludes that the words "costs of response or damages or claims" are to be read as a unit, and the entire phrase is modified by the phrase "which may be compensated under this subchapter." However, the Solicitor General, appearing on behalf of the United States as *amicus curiae*, adopts a contrary position. He contends that § 114(c) should be read to

prohibit funds whose purpose is to pay "compensation for [a] claims for any costs of response or damages[,] or [b] claims which may be compensated under this subchapter." Under the Solicitor General's view, therefore, any expense that fits CERCLA's definitions of a "claim" for "costs of response" or "damages" may not be paid by a state fund supported by special taxes, whether or not that expenditure "may" be paid by Superfund.[7] Because "costs of response" covers essentially the entire spectrum of cleanup expenses, see 42 U. S. C. § 9604, the Solicitor General's reading of the pre-emptive scope of § 114(c) might seem very broad at first reading.

The wide sweep of the Solicitor General's position, however, is tempered considerably by his interpretation of the term "claim." CERCLA defines a "claim" as "a demand in writing for a sum certain." § 9601(4). Under the Solicitor General's view, only a private party's demand upon a state fund or Superfund for reimbursement for that party's own cleanup expenses constitutes a "claim." Any State or Federal Government use of a special fund is merely a governmental expenditure, and not the payment of a "claim." Because each of the two clauses created by the Solicitor General's parsing of § 114(c) begins with the word "claims," he argues, that section does not prohibit *any* state fund expenditures for a state government's own cleanup efforts. It prohibits only expenditures to reimburse private parties. Were we to accept the Solicitor General's reading of § 114(c), therefore, New Jersey could freely tax appellants to pay for its own cleanup costs, even if Superfund might otherwise pay

---

[7] An example of a "cost of response" that would not be eligible for Superfund compensation would be the cost of a private party's cleanup efforts if that party did not receive prior authorization from the Federal Government or its agent, see 42 U. S. C. § 9611(a)(2). Under the Solicitor General's reading of § 114(c), a state fund could not reimburse those costs even though it is clear that they would not be eligible for Superfund money.

those costs. New Jersey could not, however, tax appellants to pay for third-party cleanup costs, whether or not Superfund might bear those costs. Similarly, New Jersey could not use the Spill Fund to pay for any party's "damages," defined by CERCLA to mean loss of natural resources, even though Superfund covers only "damages" suffered by governments.

The United States is not a party, of course, and all parties before us disagree with the Solicitor General's reading of the statute. However, the Solicitor General's view has considerable logical force, and assessing it will prove helpful in evaluating the parties' positions on issues as to which they disagree. Although we ultimately reject the Solicitor General's position, therefore, we find it helpful to analyze it in some detail.

One problem with the Solicitor General's view is that the distinction between a government's own cleanup costs, on the one hand, and "claims," on the other, has not been so consistent throughout CERCLA's history as the Solicitor General suggests. The 96th Congress fully considered three major hazardous substance response bills—H. R. 85, H. R. 7020, and S. 1480—in addition to the Carter administration bill, S. 1341, which died in Committee. See 1 The Environmental Law Institute, Superfund: A Legislative History xiii (1983) (hereafter Leg. Hist.).[8] The earliest of these, H. R.

---

[8] Bill H. R. 85, 96th Cong., 1st Sess., was introduced on January 15, 1979, by Representative Biaggi. After consideration in Committee, the bill was reported to the full House, see H. R. Rep. No. 96–172 (1979), but it ran into opposition from the oil and chemical industries. A substitute bill, introduced by Representative Breaux as an amendment to H. R. 85, was considered and passed by the full House. 126 Cong. Rec. 26391 (1980). The bill as passed created two funds financed from taxes on petroleum and chemical feedstocks. One fund was to provide compensation for oil spills and the other for hazardous chemical spills in navigable waters; the bill did not cover hazardous substance releases on land. The bill entitled governments and individuals to recover damages for cleanup costs and

85, had a pre-emption provision resembling § 114(c). Section 110 of the bill as passed by the House provided: "no person may be required to contribute to any fund, the purpose of which is to compensate for a loss which is a compensable damage" under that bill.[9]

---

certain economic losses, and imposed strict liability on owners and operators of vessels and other facilities.

Representative Florio introduced H. R. 7020, 96th Cong., 2d Sess., on April 2, 1980. The bill was reported out of Committee, see H. R. Rep. No. 96–1016 (1980), and enacted by the House, 126 Cong. Rec. 26799 (1980). The bill created a fund financed from a tax on oil and chemicals and from general revenues. The fund was to support government response to releases of hazardous substances, including oil, from inactive hazardous waste sites; it did not cover spills in navigable waters, nor did it provide for compensation for economic losses.

The most ambitious of the bills, S. 1480, 96th Cong., 1st Sess., was introduced by Senators Culver, Muskie, Stafford, Chafee, Randolph, and Moynihan on July 11, 1979. It was favorably reported, see S. Rep. No. 96–848 (1980). As reported, the bill provided for a $4 billion fund from general revenues and fees on petroleum and chemicals, and for strict liability for a broad range of persons responsible for releases of hazardous chemicals (not including oil). The liability and compensation provisions covered cleanup costs and a variety of private damages, including medical expenses.

As all three bills reached the Senate, S. 1480 was attacked as too comprehensive and H. R. 85 and H. R. 7020 as too weak. Eventually the Senate passed a substitute bill, see *infra*, at 368, as an amendment to H. R. 7020. The new H. R. 7020 was enacted by both Houses, and signed into law on December 11, 1980. Pub. L. 96–510, 94 Stat. 2767. See 1 Leg. Hist. xiii–xxi; see also Senate Committee on Environment and Public Works, A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund), 97th Cong., 2d Sess. (Comm. Print 1983); Grad, A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980, 8 Colum. J. Env. L. 1 (1982).

[9] As discussed in n. 8, *supra*, H. R. 85 as passed by the House provided for two funds, one to cover oil spills and the other to cover hazardous chemical spills. Section 110 applied to the oil spill fund only. Section 302 of H. R. 85 applied to the chemical spill fund, and is worded identically to § 110. We will hereafter use "§ 110" to refer to both pre-emption provisions.

The Solicitor General argues that § 110 had a purpose similar to that which he finds in § 114(c).[10] The sort of loss contemplated by the quoted language, he contends, is a loss suffered by nongovernmental entities, and not a state expenditure. This argument, however, misperceives the overall structure of H. R. 85. That bill defined compensable damages broadly, to include cleanup costs as well as injury to persons or property. Any "United States claimant" could assert a claim for these compensable damages. Significantly, a United States claimant was defined as "any person residing in the United States, the Government of the United States or an agency thereof, or the government of a State or a political subdivision thereof, who asserts a claim." § 101(p). Thus, under H. R. 85 a state government would clearly assert a "claim" for its own cleanup expenses.[11] Those expenses would constitute "compensable damages," and § 110 would therefore pre-empt the creation of a special state fund to pay such "claims."

---

[10] The Solicitor General relies on language in the House Report on H. R. 85 and in the debates to the effect that the pre-emption provision did not prevent a State from collecting taxes to pay for costs that are not "compensable damages" as defined in that bill. See Brief for United States as *Amicus Curiae* 13–15. However, as the Solicitor General misperceives the broad scope of the term "compensable damages" in H. R. 85, the use of that term in the legislative history of § 110 does not advance his argument.

[11] Bill H. R. 85, unlike CERCLA, did not provide that the President would enter into contracts with a state government under which the latter would undertake to respond to a release on behalf of the President, see 42 U. S. C. § 9604(d). Nor did it give the President special authority to respond to releases, as does CERCLA § 104. It therefore appears that H. R. 85 put both the Federal Government and the affected state government in a position closely analogous to that of a nongovernmental claimant, so far as their ability to seek compensation from the fund for costs of response to an oil spill was concerned. That fact provides further support for the argument that state governments were intended to be "claimants" under H. R. 85.

Nor do CERCLA's other predecessors support the Solicitor General's interpretation. Bill S. 1341, like H. R. 85, provided for claims by governments and had a pre-emption provision similar to § 110.[12]  Bill H. R. 7020, as first passed by the House, contained no pre-emption provision.  Bill S. 1480 was the most far-reaching of the bills considered, and the first to contemplate a fund of the magnitude of Superfund. As reported out of Committee, it contained no pre-emption provision analogous to § 114(c).

After S. 1480 ran into opposition, the Senate considered two compromise bills intended to be "a combination of the best of [H. R. 85, H. R. 7020, and S. 1480]."  126 Cong. Rec. 30935 (1980) (remarks of Sen. Stafford).  The second of these, introduced by Senators Stafford and Randolph, eventually became CERCLA.  Only with the Stafford-Randolph substitute bill did the exact language of § 114(c) come into being.  Given the remarkable similarity between a debate between Senators Bradley and Randolph on the meaning of § 114(c) and a debate between Congressmen Florio and Biaggi on the meaning of H. R. 85's pre-emption provision,[13] it is unlikely that the Senate considered the two provisions to differ substantially.  The substitute bill was prepared and passed in considerable haste, and we are reluctant to conclude that Congress intended to adopt a wholly new approach

---

[12] Section 607(b)(1) of S. 1341, 96th Cong., 1st Sess. (1979), provided that a "claim" for removal costs could be asserted "(A) by any agency of the United States Government, [and] (B) by any State, with respect to reimbursements allowed under the system established in the National Contingency Plan."  "United States claimant" was defined in exactly the same way as it was in H. R. 85.  See S. 1341, § 601(mm).  The pre-emption provision, § 612(a), provided that no court action could be maintained to recover for response costs or damages "a claim for which may be asserted under this title," and that "no person may be required to contribute to any fund, the purpose of which is to pay compensation for such a loss."

[13] Compare 126 Cong. Rec. 30949 (1980) (remarks of Sens. Bradley and Randolph), with id., at 26197–26198 (remarks of Reps. Florio and Biaggi).

to pre-emption of state funds by the slight changes in language between § 110 of H. R. 85 and § 114(c) of CERCLA.

A second reason for rejecting the Solicitor General's argument proceeds from the wording of § 114(b). That section provides: "Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation" for the same expenses under any other state or federal law. We consider the similarity between § 114(b)'s phrase "removal costs or damages or claims" and § 114(c)'s phrase "costs of response or damages or claims" to suggest that Congress intended the three terms to be read as a unit.[14] When read in conjunction with § 111(a), which provides that Superfund money may be spent on payment of governmental response costs, natural resource damages, and third-party cleanup claims, it seems likely that Congress intended the phrase "removal costs or damages or claims" to provide a shorthand for the authorized uses of Superfund. This strongly undercuts the Solicitor General's approach, because it suggests that Congress envisioned state funds paying "claims" for *all* of the authorized uses of Superfund, including state cleanup costs.

A final reason for so concluding derives from the saving provision of § 114(c). The section provides that nothing in it shall be interpreted to prevent a State from imposing a special tax to purchase or preposition equipment or otherwise prepare for a quick response to hazardous substance releases. If the pre-emption provision does not cover direct governmental expenditures at all, as the Solicitor General contends,

---

[14] Moreover, if the phrase is not to be read as a unit, but split, as the Solicitor General contends, into "claims for any costs of response or damages" and "claims which may be compensated under this subchapter," the latter phrase becomes surplusage. Under the Solicitor General's view, the only two situations that can result in a "claim" under CERCLA are first, when a third party seeks reimbursement for its "costs of response," and second, when a government seeks "damages." See 42 U. S. C. §§ 9611(a)(2), (3). Both situations, however, are already covered in the first phrase, rendering the latter superfluous.

then that saving provision is redundant. On balance, then, we conclude that the use of the term "compensation for claims" in § 114(c) represents an instance of inartful drafting rather than the intentional drawing of a subtle distinction.

## B

Having adopted the parties' view of the interpretation of "costs of response or damages or claims," we must now determine the proper interpretation of the phrase "which may be compensated under this subchapter." The New Jersey Supreme Court read that language very narrowly, concluding that it covered only expenses that are actually paid by Superfund. Appellants, adopting a broader interpretation of "may be compensated," contend that § 114(c) pre-empts any fund that is intended, in whole or in part, to pay for the same types of expenses that may be paid by Superfund.

Appellants challenge the state court's holding on several grounds. First, they contend, it is highly unlikely that a State would choose to pay such double compensation, even in the absence of an express prohibition. Second, § 114(b) provides that any person who receives compensation under Superfund "shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law." The New Jersey Supreme Court's interpretation of § 114(c), therefore, makes that section redundant. Appellants rely most heavily, however, on the literal meaning of the phrase "may be compensated." They contend that the New Jersey courts have violated the plain meaning of the statute by reading the phrase to mean, in effect, "is actually compensated."

We find these arguments persuasive. Congress has already banned double compensation in § 114(b), and there is accordingly no reason to read "may be compensated" to mean "is compensated." The contrary view adopted by the New Jersey Supreme Court renders the first sentence of § 114(c) surplusage. The language of § 114(c) permitting the States

to use general revenues for such a fund would also be meaningless under such a narrow reading.

## C

Nevertheless, New Jersey contends that the decision below, with one minor modification, is correct. New Jersey concedes that § 114(c) is not restricted to cases in which Superfund actually disburses money. New Jersey argues, however, that § 114(c) applies only when Superfund pays a claim or *would have* paid the claim had it not already been paid by the state fund. It contends that the structure and legislative history of CERCLA support its argument. We will examine each in turn.

New Jersey emphasizes the limited scope of CERCLA. The federal statute does not cover several broad areas—for example, payment for nongovernmental property losses and costs arising from oil spills—that are important aspects of hazardous substance control, and are covered by New Jersey's Spill Act. Moreover, Congress was well aware that the funding level of Superfund was and is insufficient to clean up more than a few of the most dangerous hazardous waste disposal sites. These facts, New Jersey claims, suggest that Congress recognized that Superfund would not solve all of the Nation's hazardous waste problems, and that the States would have to continue their own efforts. It follows that Congress did not intend to pre-empt state taxation to pay for cleanup efforts that the Federal Government was unable to undertake because of unavailability of funds, even though such efforts were of the type that are eligible for Superfund money.

That Congress has not chosen the most comprehensive or efficient method of attacking the problem of hazardous substance discharges, however, is no reason to depart from the language of the statute. Moreover, while we agree with New Jersey that the overall purpose of a statute is a useful referent when trying to decipher ambiguous statutory lan-

guage, remedying the Nation's toxic waste problems as effectively as possible was not the sole policy choice reflected in CERCLA. Previous attempts to enact a comprehensive hazardous substance response bill were defeated in part because of opposition by the affected industries. It seems clear that the decision to enact a pre-emption provision resulted in part from Congress' concern about the potentially adverse effects of overtaxation on the competitiveness of the American petrochemical industry.[15] That consideration, whether wise or not, cautions against our concluding that Congress would not have wanted to hinder state attempts to clean up hazardous substances in any way.

New Jersey contends, however, that its reading of § 114(c) does no violence to the statutory language. It argues that we must look not only to the provisions of CERCLA, but also to the amount of money available in Superfund, before deciding whether a particular expense "may be compensated" by Superfund. New Jersey argues that the availability of Superfund money is sufficiently low, as a practical matter, that only projects that have been actually approved, or are almost certain to be approved, can be termed "eligible" for Superfund financing, and then only to the extent of the approved funding.

We cannot agree. To say that the only expenses that "may be compensated" are those that *are* compensated twists both language and logic further than we are willing to go.

---

[15] See, *e. g.*, H. R. Rep. No. 96–172, p. 22 (1979) (accompanying H. R. 85) ("The increasing distress over the development of a multitude of State statutes related to liability and compensation for damage from oil spills, felt by those engaged in the national and international movement and storage of petroleum and petroleum products, was again articulated. It was argued that, if this continues, they will be severely hampered in their ability to conduct their operations in a manner that is economically sound and of reasonable cost to the consumer of oil"); see also 42 U. S. C. § 9651(a)(1)(F) (requiring President to report to Congress on effect of Superfund tax on "the Nation's balance of trade with other countries").

Had that been Congress' intent, it surely would have said so in plainer terms than those of § 114(c).

Comparisons with the prior bills reinforce our reading of the statute. As previously discussed, § 114(c) is derived from the pre-emption provision of H. R. 85. Section 110 of that bill pre-empted state funds whose purpose was "to compensate for a loss which is a compensable damage" under the bill. This language is not ambiguous; it clearly covers any "compensable" loss, whether or not the claimant actually receives compensation from the federal fund. Bill S. 1341 was the only other bill to contain a pre-emption provision covering state funds, prior to the 11th-hour Stafford-Randolph substitute bill. That provision also unambiguously covers any "compensable" loss.

We also fail to find sufficient support for New Jersey's position in the sparse legislative history of the Stafford-Randolph substitute bill that became CERCLA. New Jersey relies on a floor debate between Senators Bradley and Randolph on § 114(c). New Jersey is correct in arguing that some statements in that debate imply that state fund money could be used for any expense not actually paid by Superfund.[16] In view of the haste with which the bill was considered, and the ambiguities and inaccuracies included in the debate between Senators Bradley and Randolph,[17] we de-

---

[16] See, e. g., 126 Cong. Rec. 30949 (1980):

"Mr. RANDOLPH. . . . Any damage not reimbursed by this bill fund may similarly be the proper subject of a State fund if a State so chooses to construct its fund.

.        .        .        .        .

"Mr. BRADLEY. And am I also correct in noting that State funds are preempted only for efforts which are in fact paid for by the Federal fund and that there would be no preemption for efforts which are eligible for Federal funds but for which there is no reimbursement?

"Mr. RANDOLPH. That is correct."

[17] Taken, in part, word for word from the Florio-Biaggi debate, the Bradley-Randolph debate contains a number of statements that might apply to H. R. 85 but could not apply to CERCLA. Senator Bradley used

cline to attach any great significance to those statements. Moreover, as we have previously mentioned, the fact that this "debate" was essentially a reenactment of the Florio-Biaggi debate over H. R. 85's pre-emption provision implies that the Senators involved did not consider the two provisions to differ. We reject New Jersey's reading of § 114(c).

## IV

Having decided that "may be compensated" should be given its ordinary meaning, we must define the category of expenses that may be compensated by Superfund. Fortunately, CERCLA itself furnishes an appropriate test. Section 105(8)(B) of CERCLA, 42 U. S. C. § 9605(8)(B), requires the President to revise the National Contingency Plan (NCP) to reflect CERCLA's provisions. As part of that revision, the President must create and revise annually a list of sites most in need of federal efforts, now known as the National Priorities List.[18] The NCP currently specifies that removal, or immediate cleanup, will be financed by Superfund only in emergency situations, see 40 CFR § 300.65 (1985). Remedial action will be financed only for sites on the National Priorities List, § 300.68(a). Finally, the Environmental Protection Agency, pursuant to the NCP, has proposed criteria for the use of Superfund money for natural resource claims. See 50 Fed. Reg. 9593 (1985). The NCP, therefore, provides criteria that determine what expenses, at which sites,

---

the phrase "compensable damages" from H. R. 85, § 110, which nowhere appears in CERCLA § 114(c). Senator Bradley also referred to "the Secretary" in his questioning. While the hazardous substance program of H. R. 85 was under the control of the Secretary of Transportation, see § 101(a) of that bill as enacted, CERCLA's requirements are addressed to the Administrator of the Environmental Protection Agency and to the President. Finally, Senator Randolph stated that the pre-emption provision would take effect 180 days after passage of the bill—a provision that does not appear in CERCLA.

[18] The National Priorities List is set out at 40 CFR pt. 300, App. B. (1985).

will be eligible for Superfund money. We therefore conclude that the NCP provides the appropriate measure of whether a given expenditure constitutes "costs of response or damages or claims which may be compensated" by Superfund.

CERCLA also provides that a State must agree to pay at least 10% of the cost of any remedial action for a hazardous waste site within the State. 42 U. S. C. § 9604(c)(3)(C). This state share is, by definition, not eligible for Superfund money. We therefore conclude that the 10% state share is not a cost that "may be compensated" by Superfund.

To the extent that appellants argue that § 114(c) covers any cleanup or remedial expenses, whether or not eligible for Superfund compensation, we must reject their position. While we have acknowledged Congress' desire to spare the involved industries from excessive taxation, we must assume that Congress meant the words "which may be compensated under this subchapter" to have some meaning. The only plausible explanation for the use of that phrase is that Congress intended to prohibit state funds that covered Superfund-eligible expenses. Once again, we decline to second-guess the methods Congress used to achieve its purposes.

Our remaining task is to determine whether the "purpose" of the Spill Fund is to pay costs that we have found to fall within the scope of pre-emption. As we have explained above, the Spill Fund may be used for six purposes: (1) to finance governmental cleanup of hazardous waste sites; (2) to reimburse third parties for cleanup costs; (3) to compensate third parties for damage resulting from hazardous substance discharges; (4) to pay personnel and equipment costs; (5) to administer the fund itself; and (6) to conduct research. Of these, the latter four are clearly beyond the scope of CERCLA, and are therefore not covered by § 114(c). The first two are within the scope of CERCLA, except to the ex-

tent that they are intended to provide the 10% state share of remedial costs. Those parts of the statute that permit Spill Fund expenditures beyond this state share for remedial costs for sites on the National Priorities List, or for removal costs that are eligible for Superfund compensation under the terms of the NCP, are pre-empted by § 114(c).

New Jersey argues, finally, that after the enactment of CERCLA, or at least after the publication of the National Priorities List, all Spill Fund expenditures for purposes (1) and (2) above have been for non-Superfund eligible sites, and therefore are for nonpre-empted purposes. To the extent that the Spill Act permits taxation to support pre-empted expenditures, however, it cannot stand. State legislation is invalid "to the extent that it actually conflicts with federal law," *Pacific Gas & Electric Co.* v. *Energy Resources Comm'n,* 461 U. S. 190, 204 (1983), and such a conflict has been demonstrated in this case. We leave to the New Jersey Supreme Court the state-law question whether, or to what extent, the nonpre-empted provisions of the statute are severable from the pre-empted provisions. See *Exxon Corp.* v. *Eagerton,* 462 U. S. 176, 196–197 (1983). We decline the dissent's invitation to hold that the Spill Act is valid in its entirety because a substantial portion of its purposes are permissible. Such a holding would be an open invitation to the States to flout federal law by including valid provisions within clearly invalid statutes.

## V

To the extent that the New Jersey Supreme Court held that the Spill Act could constitutionally impose a tax to support expenditures for purposes that we have identified above as nonpre-empted, that court's judgment is affirmed. To the extent it held that the Spill Act could constitutionally impose a tax to support expenditures for purposes that we have identified as pre-empted, its judgment is reversed, and the case is

remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.

JUSTICE STEVENS, dissenting.

The purposes of the "Spill Fund" Act passed by the New Jersey Legislature in 1977,[1] and the "Superfund" legislation enacted by the Congress of the United States in 1980[2] overlap partially but not entirely. In the area of overlap, both statutes create funds to defray the costs of responding to environmental damage caused by the disposal of certain hazardous substances. Even in this area, however, the state and federal funds are not identical, for § 114(c) of the federal statute provides that no person may be required to contribute to any state fund if "the purpose" of the fund is to pay "compensation for claims for any costs of response or damages or claims which may be compensated under" the federal fund.[3] The question presented by this case is whether the words "the purpose" should be construed to mean "one of the purposes."

---

[1] New Jersey Spill Compensation and Control Act (Spill Fund), N. J. Stat. Ann. §§ 58:10–23.11 to 58:10–23.11z (West 1982 and Supp. 1985).

[2] Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund or CERCLA), 94 Stat. 2767, 42 U. S. C. § 9601 *et seq.*

[3] Section 114(c) of Superfund states in full:

"Except as provided in this Act, no person may be required to contribute to any fund, *the purpose* of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under this title. Nothing in this section shall preclude any State from using general revenues for such a fund, or from imposing a tax or fee upon any person or upon any substance in order to finance the purchase or prepositioning of hazardous substance response equipment or other preparations for the response to a release of hazardous substances which affects such State." 94 Stat. 2796, 42 U. S. C. § 9614(c) (emphasis added).

I

Both parties agree that the New Jersey Spill Fund was created to serve multiple purposes, and that at least some of these purposes are not expressly described in § 114(c).[4] Moreover, even if the bulk of the moneys in the Spill Fund has to date been expended in furtherance of purposes served by the federal Superfund, there is no reason to believe that the separate purposes are pretextual or illegitimate, or that in the future New Jersey will not use its Spill Fund to meet an ecological threat, such as an oil spill, for which Superfund

---

[4] As appellants concede, the New Jersey Spill Fund "has subsidiary purposes that do not duplicate those of CERCLA." Brief for Appellants 22, n. 24. For example, while Spill Fund moneys may be used to pay for petroleum and crude oil spills, N. J. Stat. Ann. § 58:10–23.11b(k) (West Supp. 1985), Superfund expressly excludes such pollutants from its definition of "hazardous substances," § 101(14), 94 Stat. 2769, 42 U. S. C. § 9601(14). In addition, New Jersey's Spill Fund authorizes payments for income or property value losses caused by damage resulting from a discharge of hazardous substances, and covers the cost of restoration or replacement of natural resources damaged or destroyed by a discharge. N. J. Stat. Ann. § 58:10–23.11g(a) (West 1982). In contrast, the federal Superfund provides limited damages coverage in relation to natural resources, and authorizes such compensation only if the release occurred after December 11, 1980, and only if the claimants are the United States or a State. §§ 107(a)(4)(A), 107(f), 111(c)(2), 111(d)(1), 94 Stat. 2781, 2783, 2789–2790, 42 U. S. C. §§ 9607(a)(4)(A), 9607(f), 9611(c)(2), 9611(d)(1). Additional expenditures authorized by the State Spill Fund, but not by its federal counterpart, include (1) the purchase and prepositioning of equipment to respond to release of hazardous substances, compare N. J. Stat. Ann. § 58:10–23.11o(4) (West Supp. 1985), with § 114(c), 94 Stat. 2796, 42 U. S. C. § 9614(c); (2) expenses related to administration of the State Spill Fund, see N. J. Stat. Ann. § 58:10–23.11o(4); and (3) research concerning pollution and cleanup techniques, including ocean pollution, see §§ 58:10–23.11o(3), (5). The Spill Fund statute is also authorized to pay the 10% state share "of the costs of the remedial action, including all future maintenance" required in order to qualify for federal funding which is not compensated by Superfund, § 104(c)(3), 94 Stat. 2775–2776, 42 U. S. C. § 9604(c)(3). See N. J. Stat. Ann. §§ 58:10–23.11o(1), (2) (West Supp. 1985). Appellants argued in state court that taxes for this purpose contravene § 114(c).

makes no provision. See Tr. in Nos. SC 319A–81 and SC 303A–81, p. 21 (N. J. Tax Court).

These concededly legitimate state purposes are, in my view, sufficient to validate the tax supporting New Jersey's Spill Fund. First, § 114(c) literally pre-empts only taxes to support state funds for which "the purpose" is to compensate for claims compensable under Superfund. In accordance with this language, contributions to state funds would be pre-empted only if their sole purpose—or perhaps their only nontrivial purpose—was to compensate for claims covered by Superfund. Unless Congress intended to forbid further contributions to state funds merely because they have not expended "sufficient" moneys on legitimate state objectives (whatever that threshold amount should be), New Jersey's Spill Fund unquestionably escapes the pre-emptive sweep of § 114(c).

If this purely literal reading of § 114(c) resulted in manifest injustice, or were plainly at war with the probable intent of Congress, I would reject it. But such a reading is consistent with the sparse legislative history that has been called to our attention.[5] In the debate on the Senate floor, New Jersey Senator Bradley pointed out that his State had enacted a "Spill Compensation Fund" supported by "a tax applied to transfers of petroleum and a tax on nonpetroleum hazardous substances." 126 Cong. Rec. 30949 (1980), reprinted in Sen-

---

[5] The explanation for the absence of committee reports and for the brief remarks on the floor lies in the fact that the compromise legislation that became Superfund was introduced as a floor amendment in the Senate in the waning days of the lame-duck session of the 96th Congress. The lineal ancestor of Superfund, S. 1480, was reported out of Committee on November 18, 1980—after the national elections had changed the political complexion by assuring the Republicans control of the Presidency and of the Senate in 1981. In the aftermath of the November elections, S. 1480, along with three other bills, became the subject of an 11th-hour compromise forged primarily in the Senate. The original provision in S. 1480 for a $4.1 billion fund was dramatically reduced to $1.6 billion and, of importance to our inquiry, § 114(c) was added.

ate Committee on Environment and Public Works, A Legis-
lative History of the Comprehensive Environmental Re-
sponse, Compensation, and Liability Act of 1980 (Superfund),
97th Cong., 2d Sess., 731 (Comm. Print 1983) (hereinafter 1
Leg. Hist.). Acknowledging industry's fear that it might be
forced to bear a "double tax," *ibid.*, the Senator propounded
a series of questions to Senator Randolph of West Virginia,
the bill's sponsor in the Senate, to clarify the scope of
§ 114(c). This colloquy, as I read it, is generally in keeping
with pre-emption of nothing more than state taxation to sup-
port funds for which "the purpose" is to compensate for
claims covered by Superfund:

"Mr. BRADLEY.

. . . . .

"Am I correct in understanding that it is the purpose
of this legislation [§ 114(c)] to prohibit States from re-
quiring any person to contribute to a fund *for the pur-
pose* of reimbursing claims already provided for in this
legislation?
"Mr. RANDOLPH. Yes, that is the clear intent. The
purpose is to prohibit States from creating *duplicate
funds* to pay damage compensable under this bill.
"Mr. BRADLEY. However, there is *no such preemp-
tion* of a State's ability to collect such taxes or fees for
*other costs* associated with releases that are not compen-
sable damages as defined in this legislation.
"Mr. RANDOLPH. The Senator is correct.

. . . . .

"Nothing in the language or intent of this bill would
prohibit a State from using its fund for the purposes you
have inquired about. The purpose of this legislation is
simply to preempt *double taxation* of the substances
enumerated in the bill *for the purposes* of compensation
of the covered damage. . . .

*"Any damage not reimbursed* by this bill fund may similarly be the proper *subject* of a State fund if a State so chooses to construct its fund. . . .

.        .        .        .        .

". . . What this bill does is prohibit a State from requiring any person to contribute to any fund if *the purpose* of that fund is to compensate for a claim paid for under the provisions of this bill. Thus the State cannot receive a fee or a tax on a substance if that fee or tax is to go into a fund *and the fund is for the purpose* of paying [compensable] claims.

"Putting it simply, this is a prohibition against *double taxation for the same purposes. It [does] not . . . prohibit a State from imposing fees or taxes for other purposes . . . .*

"In summary, Mr. President, this preemption provision is narrow in scope and limited to the particular purpose of preventing double taxation." 126 Cong. Rec., at 30949 (emphasis added), reprinted in 1 Leg. Hist. 731–733.[6]

---

[6] I recognize that some language in this colloquy may be read to imply that § 114(c) pre-empts only those state funds whose purpose is to compensate for claims actually paid for by Superfund. See 126 Cong. Rec. 30949 (1980) (remarks of Sen. Bradley and Sen. Randolph), reprinted in 1 Leg. Hist. 731–732. See also 97 N. J. 526, 536–544, 481 A. 2d 271, 276–281 (1984). I agree with the Court that this interpretation conflicts with the "may be compensated" language of § 114(c), would trivialize it by rendering only actual conflicts pre-empted, and would render superfluous the proviso to § 114(c) that States may use "general revenues for such a fund" to pay "costs of response or damages . . . which may be compensated" under Superfund. See *ante,* at 370–371. Besides, it seems odd to suppose that States would choose to compensate claims already redressed by federal funds. In addition to these deficiencies, the colloquy inaccurately refers to a 180-day grace period before pre-emption would take effect and to compensation for damage caused by oil spills. See *ante,* at 373–374, n. 17. In light of the haste with which this legislation was passed, and the consequent inaccuracies of some of the remarks regarding the details of the legislation, I consider the remarks on the floor only at a high level of generality.

The legislation passed by the Senate was introduced in the House of Representatives by Representative Florio of New Jersey, whose brief remarks on the floor are likewise consistent with construing § 114(c) to pre-empt taxation to support state imitations of Superfund:

> "Regarding the preemption language contained in these amendments, I would point out that some States, including my own State of New Jersey, have successful spill funds and that while States may not create *duplicate funds* to pay damages compensable under this bill, there is *no preemption* of the State's ability to collect taxes on fees for *other costs* associated with releases that are *not compensable damages* as defined in this legislation.
>
> ". . . Putting it simply, this is a prohibition against *double taxation for the same purposes*." 126 Cong. Rec. 31965 (1980) (emphasis added), reprinted in part in 1 Leg. Hist. 780.

As I see it, if Congress had intended to forbid any further contributions to the New Jersey Spill Fund—the existence of which it was made acutely aware—it surely could have expressed that intent in less ambiguous language than is found in § 114(c). Indeed, if that had been its purpose, I would expect it to be revealed either in a committee report or in some unequivocal comment during the debates on the legislation. I have found no such legislative history. In my opinion, we should not presume pre-emption unless Congress clearly identifies its intent to curtail the lawmaking power of a sovereign State, either by careful draftsmanship of its pre-emptive command or by necessary implication based on the scope of its entire regulatory program.[7] The language of § 114(c) is

---

[7] See *Chicago & N. W. Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 317 (1981) ("Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the

simply too opaque to support the broad prohibition that appellants ask us to find in it.

## II

For the foregoing reasons, the New Jersey Spill Fund tax is not a "contribut[ion]" to a fund "the purpose of which is to pay compensation for claims . . . which may be compensated under" Superfund. Because there exist several legitimate purposes for which New Jersey may expend funds, "the purpose" of the State Spill Fund does not duplicate the purpose of Superfund, and the tax levied to support it is to that extent unquestionably valid under § 114(c). Moreover, while the Spill Fund is by statute available (and has been used) for the purpose described in § 114(c), the State Fund's compensation for claims covered by its federal counterpart does not entitle appellants to a *pro tanto* refund of taxes on a theory that the Spill Fund is "partially pre-empted." The unqualified language of § 114(c) either forbids all contributions to the Fund or it forbids none; it affords no basis for objecting to a tax for the concededly legitimate state purposes identified earlier, see n. 4, *supra*.

But since the Court concludes that the Spill Act is "preempted in part," *ante*, at 358; accord, *ante*, at 376, it must confront the difficult question of relief. In keeping with its "partial pre-emption" analysis, the Court should advise the New Jersey courts how they should calculate the partial refund of taxes to which appellants are presumably entitled on remand. For example, must appellants be refunded the percentage of Spill Act taxes expended on Superfund-compensable claims in the tax years in question, or may the State reduce their refund by imputing an average annual cost for the cleanup of oil spills, which are one of the contingencies against which the Spill Fund was intended to accumulate reserves but which has not yet occurred?

Congress has unmistakably so ordained'" (quoting *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963)).

Rather than facing up to the difficult but essential remedial choices to which its analysis inescapably gives rise, the Court takes the entirely unresponsive course of resolving a lawsuit that has not yet been filed. In the litigation it apparently contemplates, a contributor to the Spill Fund has challenged a particular expenditure of the Fund as being in conflict with § 114(c). In this situation, I might agree that the purpose of § 114(c)'s pre-emption of double *taxation* prevents New Jersey from *spending* these moneys on activities compensable under Superfund. Taxing and spending are obviously linked in § 114(c): taxes may not be levied to support funds indemnifying claims compensable under Superfund. Given this linkage, the hypothetical plaintiff might argue that § 114(c)'s prohibition of "double taxation" pre-empts state expenditures of Spill Fund moneys for Superfund-compensable claims generally, whether collected in a separately identifiable fund or not, on the theory that such expenditures would constitute the functional equivalent of a distinct "fund" whose purpose is to pay claims compensable under Superfund.[8]

---

[8] New Jersey recognizes an obligation to expend Spill Fund moneys in furtherance of purposes not benefited by Superfund, and has promulgated regulations intended to promote administration of the State Spill Fund in conformity with Superfund by circumscribing permissible expenditures. See Regulations Governing New Jersey Spill Compensation Fund Expenditures in Light of Federal Superfund Law, N. J. Admin. Code 17:26–2.1 (Supp. 1985). These regulations limit Spill Fund expenditures to the following eight purposes: (1) "[t]he clean-up and removal of a petroleum or petroleum products discharge"; (2) certain third-party damages payments; (3) "[t]he administrative costs of the fund"; (4) "[t]he cost of purchasing or pre-positioning hazardous substance response equipment or other preparations for the response"; (5) the 10% state share of remedial costs; (6) the advancement of moneys for the cleanup and removal of hazardous substances for which the State has a prior commitment for reimbursement from Superfund; (7) for the above purpose if the state fund administrator promptly applies for federal reimbursement; and (8) any payments authorized by the Act using tax revenues collected before the effective date of Superfund. 14 N. J. Reg. 36(b) (1982). Appellants have contested only purposes five through seven. See App. to Brief on Behalf of Plaintiffs-

But whatever the merits of the hypothesized challenge to particular state expenditures, the case or controversy which would raise it is *not* before this Court. Appellants challenge the Spill Fund tax in its entirety; they make no claim for a partial refund. App. to Brief on Behalf of Plaintiffs-Appellants in No. A–3913–81T1 (N. J. Super. Ct.), pp. 2a–7a (N. J. Tax Court Complaint ¶¶ 3–4); *id.*, at 16a–23a (N. J. Chancery Division Complaint ¶¶ 11–36); Tr. in Nos. SC 319A–81 & SC 303A–81, p. 34 (N. J. Tax Court). This litigation does not concern any particular expenditure of Spill Fund assets for *any* purpose, let alone the purpose described in § 114(c).[9] As a consequence, it is plainly inappropriate to let stand the Spill Fund tax challenged by appellants and instead order New Jersey to restrict Fund expenditures not properly before us.

Of course, if the hypothesized challenge were successful, the Court would be entirely correct that the next question would be whether New Jersey would have set the same tax rate despite circumscription of the purposes for which the Fund might be expended, and that this state-law question should be left for the New Jersey courts.[10] The only ques-

Appellants in No. A–3913–81T1 (N. J. Super. Ct.), pp. 122a–126a. See also n. 4, *supra.* Appellants' challenge to the validity of the fifth purpose is not pressed in this Court; the sixth and seventh purposes provide for the advancement of cleanup funds (in effect, loans) in anticipation of an award of federal funds.

These regulations were held invalid by the New Jersey intermediate appellate court for failure to satisfy a statutory notice period, 190 N. J. Super. 131, 133–134, 462 A. 2d 193, 195 (1983), and they are not before us. According to the New Jersey Office of Administrative Law, the regulation, although invalid, is still "on the books." Further action presumably awaits the decision of this Court.

[9] Indeed, the record on which the New Jersey Tax Court awarded summary judgment was so lacking in information regarding Spill Fund expenditures that appellants saw the need to supplement the record in this Court.

[10] If the New Jersey courts were to hold that the proscribed purposes were severable from the permissible ones, appellants would be entitled to

tion before us today, however, is whether "the purpose" of the New Jersey tax is to fund claims which may be compensated under Superfund. For me, the universal agreement that the tax moneys poured into New Jersey's Spill Fund may be spent in furtherance of entirely valid purposes is sufficient to sustain the state tax.·

The judgment of the Supreme Court of New Jersey should be affirmed.

---

no refund. If they were to find instead that the legitimate purposes were inseparable from the purposes described in § 114(c), the Spill Fund would stand or fall in its entirety.

It seems likely that the New Jersey courts would find the invalid provisions severable. The New Jersey Tax Court found a "legislative intent that every purpose of spill fund was to be accomplished" and concluded that "the Legislature specifically envisioned that the spill act would be enforced in conjunction with any other applicable law." *Exxon Corp.* v. *Hunt*, 4 N. J. Tax 294, 320 (1982). Accordingly, it held that "even if § 114(c) of super fund could be construed to preempt part of spill fund, the aforementioned nonpreempted areas are more than sufficient to sustain its continued validity." *Ibid.* The New Jersey Supreme Court acknowledged the Tax Court's alternative holding, but relied on its primary holding that § 114(c) pre-empted only claims actually compensated to uphold the Spill Fund. See 97 N. J., at 530, 481 A. 2d, at 273.