351 S.E.2d 605

David C. CALLAGHAN, Director, West Virginia Department of Natural Resources, et al.

v.

EASTERN ASSOCIATED COAL CORP.

No. 16597.

Supreme Court of Appeals of West Virginia.

April 3, 1986.

Concurring Opinion Dec. 4, 1986.

Robert D. Cline, Jr., Harry G. Shaffer, Shaffer & Shaffer, Madison, for appellant.

John C. Purbaugh, David B. McMahon, Charleston, for intervenors.

Gregory R. Gorrell, Jackson, Kelly, Holt & O'Farrell, Charleston, for amicus curiae, W.Va. Coal Assn.

Charles G. Brown, Atty. Gen., Bethany R. Boyd, Asst. Atty. Gen., Charleston, for appellees.

BROTHERTON, Justice:

We are asked today to determine who bears financial responsibility for reclamation of a coal refuse dam built in the 1940's by the defendant, Eastern Associated Coal Corporation. The plaintiff, director of the Department of Natural Resources (now the Department of Energy, hereinafter referred to as "DNR"), originally asserted that Eastern should pay for the clean-up pursuant to the 1972 West Virginia Coal Refuse Disposal Act. That position has since been abandoned by DNR, which sought dismissal of this action prior to hearing, but has been picked up by the intervenors herein, who are residents of communities located below other coal refuse dams. Eastern contends that because it has not actively employed the dam since 1966, it has no responsibility for reclamation under state law, and that the site therefore qualifies for federal clean-up funds. We find that the dam in question was not "abandoned" under the state law in effect at the time DNR issued its clean-up order, and that, therefore, Eastern does have a legal duty to pay for securing the dam and abating conditions constituting an imminent danger to human life. To the extent that the 1979 order directed additional actions by Eastern, however, it exceeded the scope of liability placed on known operators of coal refuse dams by the 1972 Act. The judgment of the circuit court directing compliance with the di-

rective from DNR is therefore affirmed in part and reversed in part.

The coal refuse disposal pile that is the subject of this suit is located on Low Gap Branch of Toney Fork of Clear Fork of the Guyandotte River, in Wyoming County, West Virginia, on property leased by Eastern from Pocahontas Land Corporation. It is an embankment of coarse coal refuse, approximately 165 feet high, which extends approximately 700 feet across Low Gap Hollow. Eastern built the dam between 1942 and 1946. In the early 1960's Eastern pumped fine refuse, or slurry, from a preparation plant into the area behind the embankment. The dam impounded the slurry and allowed the water to seep out, which cleaned out the fine refuse. Eastern discontinued this practice in 1966, and has not used the Low Gap refuse pile for any purpose since that time. The embankment at one time impounded a large quantity of water, but Eastern drained the water pursuant to an earlier directive from DNR, and cut a spillway through the dam so that it would remain drained. The Low Gap pile currently impounds only 3.75 acres at normal pool.

On November 26, 1979, DNR ordered Eastern to perform specific remedial work on the Low Gap refuse pile.[1] The estimated cost of the work is between $200,000 and $700,000. Eastern appealed the order through the administrative process, and, in March, 1981, filed a declaratory judgment action in the Circuit Court of Kanawha County, seeking a clarification of the statutory definition of "operate" for purposes of determining who was responsible for reclaiming the Low Gap site.

In an order entered April 12, 1984, incorporating a letter opinion dated March 15, 1984, Judge A. Andrew MacQueen, III, of the Circuit Court of Kanawha County, found in favor of DNR, requiring Eastern to perform the remedial work at its own expense. Eastern appealed that order to this Court, asserting that clean-up with fed-eral Abandoned Mine Reclamation funds is dictated by both the letter and the spirit of our state enactments. DNR filed a brief in support of Judge MacQueen's opinion, but later joined Eastern in a joint motion for voluntary dismissal, based on DNR's agreement that the Low Gap pile is not an active operation and should be considered for eligibility for AMR funds. In a memorandum in support of the motion to dismiss, DNR attributed its change of heart to its desire to best protect the citizens of this State, and acknowledged that protracted litigation such as this prevents the prompt and efficient reclamation of abandoned mine properties.

I.

This case presents a single question: Who will pay for the reclamation of the Low Gap refuse dam? Because the answer depends on a state statute that has been superseded twice since this case began, and its interaction with a federal statutory scheme, we undertake first a review of the relevant legislation.

The law in effect in 1979, when the order was issued, was the 1972 Coal Refuse Disposal Act, as amended in 1974. W.Va.Code ch. 20, art. 6C. The 1972 statute was enacted in response to the Buffalo Creek disaster, which occurred when a slag dam operated by Pittston Mining ruptured, at a tremendous cost in lives and property. The act provided for safety evaluations of all coal refuse disposal piles in the state. It then directed specific remedial action with respect to three categories of refuse piles. First, piles constituting an imminent danger to human life were governed by Code § 20–6C–5 (1978) (repealed 1981). The director of DNR was empowered to "enter upon the premises where any such coal refuse pile exists and take all remedial action as may be necessary or expedient to secure such coal refuse disposal pile and to abate the conditions which cause the danger to human life." The director was authorized to spend state funds for such ac-

---

1. The order required Eastern to (1) prepare a plan for monitoring the dam during heavy rainfall and warning downstream residents of a dam failure; and (2) prepare plans for elimina-tion of the hazard potential of the dam, including hydrological analysis, elimination of the water pool, upgrading stability, and reclamation.

tion, but the statute required that any funds so spent must be recovered from the operator of the refuse pile. The second category was "dangerous conditions not imminently dangerous." Its application was limited to refuse piles created or operated after the effective date of the statute, March 11, 1972, which makes it inapplicable to the dam in this case. W.Va.Code § 20–6C–6 (1978) (repealed 1981). Third, the 1972 Act authorized DNR to expend state and federal funds to reclaim "abandoned" coal refuse piles. W.Va.Code § 20–6C–7a. By amendment in 1974, the legislature defined "abandoned coal refuse disposal pile" as one

> ... which has not been operated in whole or in part since the first day of January, [1969], and the operator or owner of which cannot be determined, or if the operator is known, he cannot be compelled to reclaim the coal refuse disposal pile ...

W.Va.Code 20–6C–2(a) (1978) (repealed 1981). The 1972 Act thus required a known owner or operator of a refuse dam constituting imminent danger to human life to bear financial responsibility for abating the dangerous condition, and authorized the use of state or federal funds to reclaim abandoned refuse dams.

In 1977, Congress enacted the Surface Mining Control and Reclamation Act of 1977, or "SMCRA," 30 U.S.C. § 1201 et seq. (1982). SMCRA set up a national program for reclamation of land and water affected by past and future surface coal mining. Subchapter IV of SMCRA, 30 U.S.C. §§ 1231–1243, concerns abandoned mine reclamations. It establishes the Abandoned Mine Reclamation Fund ("AMR Fund"), comprised primarily of fees collected from coal mine operators.[2] Upon approval of a reclamation plan, a state such as West Virginia becomes eligible for AMR funds for reclaiming and restoring abandoned mine lands, including abandoned coal refuse disposal areas.[3] 30 U.S.C. §§ 1231, 1235. Lands and water eligible for reclamation under this program

> ... are those which were mined for coal or which were affected by such mining, wastebanks, coal processing, or other coal mining processes, and *abandoned or left in an inadequate reclamation status prior to August 3, 1977, and for which there is no continuing reclamation responsibility under State or other Federal laws.*

30 U.S.C. § 1234 (emphasis added).[4]

Because the coal refuse dam in this case is eligible for reclamation with federal AMR funds only "if there is no continuing reclamation responsibility" under West Virginia law, a resolution of the issue of liability under the 1972 Coal Refuse Disposal Control Act and subsequent enactments is necessary before Eastern or DNR can apply for federal clean-up money for the Low Gap site.

The West Virginia legislature amended and reenacted the 1972 Act in the Abandoned Mine Lands and Reclamation Act, effective January 19, 1981, following ap-

---

**2.** The standard reclamation fee is 35 cents per ton of coal produced by surface mining, and 15 cents per ton of coal produced by underground mining, or 10% of the value of the coal at the mine, whichever is less. 30 U.S.C. § 1232(a). Eastern submitted that it had paid over $11,000,000 into the fund as of September 30, 1985.

**3.** Fifty percent of the funds collected annually are allocated automatically to the state in which they were collected, and the remainder of the money is allocated by the Secretary of the Interior. 30 U.S.C. § 1232(g) (1982). This, along with the fact that even the automatic 50% share will be forfeited for reallocation if not spent within three years, puts a premium on preparing and submitting reclamation plans for as many sites as possible in order to receive a larger share of the federal fund. *See id.*

**4.** Although the parties did not raise the issue of federal preemption of the 1972 West Virginia act, we have considered that issue, especially in light of the recent decision of the United States Supreme Court in *Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) (New Jersey Spill Compensation and Control Act preempted, in part, by federal law creating Superfund, for imposing a state tax for purposes that may be compensated with federal tax). We believe, however, that SMCRA avoids any conflict that would require a finding of preemption, because eligibility for federal funds in this case hinges on a finding that there is no responsibility for reclamation under state law. Application of our state law does not, therefore, interfere with implementation of the federal act.

proval of the West Virginia state program under SMCRA by the United States Department of the Interior. *See* ed. note, W.Va.Code ch. 20, art. 6C (1981). The legislature clearly intended by this enactment to take maximum advantage of money available from the AMR Fund. The 1981 Act cites and describes Title IV of SMCRA in its declaration of purpose, and concludes:

> Therefore, it is the intent of the legislature by this article to vest jurisdiction and authority in the director of the department of natural resources to allow for expedient program approval by, and receipt of funds from, the United States department of the interior to accomplish the desired restoration and reclamation of our land and water resources.

W.Va.Code § 20–6C–2 (1981) (repealed 1985). The 1981 Act, like the federal law, says that eligible lands and water are those "abandoned or left in inadequate reclamation status prior to [August 3, 1977], and for which there is no continuing reclamation responsibility." W.Va.Code § 20–6C–4(b)(2) (1981) (repealed 1985). The definition of "abandoned" from the previous statute was dropped.[5]

The state Abandoned Mine Lands and Reclamation Act was again repealed, and reenacted as chapter 22, article 3, in 1985. For purposes of this case, the 1985 Act does not materially depart from the 1981 statute.

## II.

The disputed order was issued in 1979, and its validity must therefore be determined under the 1972 Act, as amended. The 1972 Act authorizes expenditure of public money for reclamation of "abandoned" coal refuse disposal piles, and the statutory definition of "abandoned" squares well with the meaning of that term as it is commonly understood. A pile is abandoned if (1) it has not been operated since January 1, 1969, *and* (2) the owner or operator of the pile cannot be determined, or cannot be compelled to reclaim the pile.[6] W.Va.Code § 20–6C–2(a) (1978) (repealed 1981).

◼ The court below focused on the first prong of the definition, specifically the statutory definition of "operates." It held that the coal refuse dam in this case was "operated" after January 1, 1969, because it impounded water. We do not believe that either the statutory definition or the ordinary meaning of "operate" encompasses the passive impoundment of water. The 1972 Act provided that:

> "Operate" means to enter upon a coal refuse disposal pile, or part thereof, for the purpose of disposing, depositing or dumping coal refuse thereon, *or to employ a coal refuse pile for retarding the flow of or the impoundment of water....*

W.Va.Code § 20–6C–2(e) (1978) (repealed 1981) (emphasis added). "To employ" a dam requires purpose and intent. Eastern employed the dam to impound water when it pumped slurry behind it in the early 1960's. The record in this case does not, however, support a finding that Eastern has "employed" the dam for any purpose since January 1, 1969, and the first prong of the test for abandonment thus is satisfied.

◼ Although the parties directed little attention to the second prong of the statutory definition, it is there that we find an obstacle to Eastern's contention that the dam was abandoned. An abandoned pile is one which has not been operated since 1969, "*and* the operator or owner of which cannot be determined,...." W.Va.Code § 20–6C–2(a) (1978) (repealed 1981) (emphasis added). It is undisputed in this case that Eastern built the dam, Eastern at one

---

5. Section 20–6C–3 of the 1981 Act incorporates by reference all definitions set forth in chapter 20, article 6, the 1981 West Virginia Surface Coal Mining and Reclamation Act, and that act does not define "abandoned." It does define "operates" as it was defined in the 1972 Act. *See* W.Va.Code § 20–6–13(f) (Supp.1980) (repealed 1985).

6. The definition, quoted earlier in this opinion, appears to use "operator" and "owner" of a refuse dam interchangeably. Neither term should be confused with "landowner," which is also a term used in the statute. *See, e.g.,* W.Va. Code §§ 20–6C–5 (1978) (repealed 1981).

time operated the dam, and the dam is located on property held by Eastern under lease. An argument could be made that Eastern ceased being the "operator" of the dam when it stopped using it, *see,* W.Va. Code § 20–6C–2(e) & (f) (1978) (repealed 1981), but we deem it unlikely that the legislature intended anything so technical. Even if Eastern is not a current "operator," it is nevertheless the "owner" of the dam,[7] and we see no way to conclude that the operator or owner of this dam cannot be determined.[8] The Low Gap refuse dam is not; therefore, an abandoned coal refuse disposal pile under the 1972 Act.

■ Our analysis of Eastern's legal liability does not end there, however. Code § 20–6C–5 (1978) (repealed 1981) authorized the director of DNR to take remedial action to abate conditions constituting imminent danger to human life, and to recover state funds expended for this purpose from the operator of the coal refuse pile. The statute, quoted in full, reads:

Whenever the director finds that a coal refuse disposal pile constitutes imminent danger to human life, he may, without the necessity of obtaining the permission of the operator or the landowners involved, enter upon the premises where any such coal refuse disposal pile exists and *take all remedial action as may be necessary or expedient to secure such coal refuse disposal pile and to abate the conditions which cause the danger to human life.*

The costs reasonably incurred in any remedial action taken by the director under this section shall be paid for initially by funds appropriated to the department of natural resources for such purposes, and such sums so expended shall be recovered from the operator by appropriate civil action to be initiated by the attorney general upon request of the director.

(emphasis added). The statute requires that such dangerous dams be secured, and the dangerous conditions alleviated. It does not require that such dams be reclaimed. The only reclamation directed by the 1972 Act is reclamation of abandoned dams. W.Va.Code § 20–6C–7a (1978) (repealed 1981). That statute includes no blanket obligation to reclaim all coal refuse disposal piles.

This restriction of reclamation responsibility to abandoned refuse piles is echoed throughout the 1972 Act. Section 20–6C–2(g) defines "reclamation of abandoned coal refuse piles," but not "reclamation" alone; section 20–6C–3(d) recites the intent of the legislation as:

... to provide for the location, inspection and evaluation of all coal refuse disposal piles and any associated water impoundments in this State; for the determination of their degree of stability, safety, adequacy and hazard to life and property; *for remedial action necessary and expedient to prevent, correct or abate danger to life caused by any coal refuse disposal pile* and any associated water impoundment; *and for the reclamation of abandoned coal refuse disposal piles.*

(emphasis added).

This distinction is understandable in light of the reason for enacting the 1972 statute, which was the Buffalo Creek flood. The legislature appears to have considered correcting unsafe conditions its main priority, and did not hesitate to make coal operators bear the cost. It stopped short, however, of mandating blanket reclamation at private expense.

We conclude, therefore, that under the 1972 Coal Refuse Disposal Act, Eastern is responsible for securing the Low Gap refuse pile and abating the conditions which endanger human life. The decision of the circuit court is affirmed to the extent that it relates to those costs. The order issued

---

7. The legislature's use of "owner" and "operator" throughout the statute is confusing. The definition of "abandoned" indicates that refuse dams not operated since 1969, but having a known owner or operator, are not "abandoned." A subsequent statute, however, refers to the "owner" of an "abandoned" refuse pile. W.Va. Code § 20–6C–7a(b)5 (1978) (repealed 1981). We can only surmise that the latter reference is meant to apply to an owner who has not also operated the refuse dam, as when, for example, property on which an inactive refuse dam is located changes hands.

8. The statute also excludes an operator who cannot be compelled to reclaim the site, but that exception is similarly inapplicable.

by DNR, however, appears to go beyond such obligations. To the extent that it orders reclamation that is separable from the obligations supported by the 1972 Act, it is invalid.

## III.

■ The action underlying this appeal sought construction of both the 1972 and 1981 statutes, and we do not, therefore, feel constrained to limit our analysis to the act in effect when the order was issued. The overall question in this case is whether there is *any* continuing reclamation responsibility that would preclude application for federal AMR funds. As noted above, the legislature, enacting the 1981 Abandoned Mine Lands and Reclamation Act, W.Va. Code, ch. 20, art. 6C (1981) (repealed 1985) had as its primary goal qualification for and utilization of the federal AMR Fund. *See* W.Va.Code §§ 20–6C–2, 20–6C–4 (1981) (repealed 1985). It addresses only abandoned sites, and imposes no independent reclamation standards. The legislature enacted the 1981 statute together with the 1981 Surface Coal Mining and Reclamation Act, W.Va.Code ch. 20, art. 6 (1981) (repealed 1985). The latter enactment revised and expanded prior law to establish a comprehensive scheme for requiring and enforcing the reclamation of land and water affected by surface mining. As part of its general performance standards, the 1981 Surface Mining Act addressed both new and existing coal mine waste piles:

> The reclamation commission shall promulgate regulations for the design, location, construction, maintenance, operation, enlargement, modification, removal and abandonment of *new and existing* coal mine waste piles.... Provided, that whenever the director finds that any coal processing waste pile constitutes an imminent danger to human life, he may, in addition to all other remedies and without the necessity of obtaining the permission of any person prior or present who *operated or operates* the pile or the landowners involved, enter upon the premises where any such coal processing waste pile exists and may take or order to be

taken such remedial action as may be necessary or expedient to secure such coal processing waste pile and to abate the conditions which cause the danger to human life: Provided, however, that the cost reasonably incurred in any remedial action taken by the director under this subsection may be paid for initially by funds appropriated to the department of natural resources for such purposes, and such sums so expended shall be recovered from any responsible operator or landowner, individually or jointly, by suit initiated by the attorney general at the request of the director. *For purposes of this subsection "operates" or "operated" means to enter upon a coal processing waste pile, or part thereof, for the purpose of disposing, depositing, dumping coal processing wastes thereon or removing coal processing waste therefrom, or to employ a coal processing waste pile for retarding the flow of or for the impoundment of water.*

W.Va.Code § 20–6–13(f) (1981) (repealed 1985). This section incorporates the provision construed above, § 20–6C–5 of the 1972 Act. It also uses virtually the same definition of "operate." As we concluded above, this provision authorizes the director of DNR, in his discretion, to order that certain measures be taken to ensure the safety of residents below the dam, but does not impose independent reclamation responsibility on the owner or operator.

Based on a clear legislative intent in the Abandoned Mine Lands Act, and no clear imposition of reclamation responsibility, we hold that Eastern has no continuing reclamation responsibility under the 1981 Act with respect to the Low Gap dam. It must, however, comply with the 1979 order to the extent that that order directs securing of the dam and abating its dangerous condition.[9]

Obvious policy considerations support this decision. The interests of Eastern, the intervenors, and the people of this State are best served by a fair and efficient program for eliminating coal refuse disposal dams and associated water impoundments that were created before state or

---

**9.** Neither the trial court nor this Court heard evidence on the specific components of the rec-

lamation plan, and thus we cannot set out in detail which expenses are eligible for AMR

federal governments enacted reclamation standards. The sooner this can be accomplished, the better. By reviewing these coal refuse disposal sites for eligibility under the Abandoned Mine Lands and Reclamation Act, the Department of Energy, as successor to DNR, will be able to ensure that the interests of the people of West Virginia, such as the intervenors, are fully and expeditiously protected.[10]

For the reasons set out above, the decision of the Circuit Court of Kanawha County is affirmed insofar as it addressed securing of the dam and alleviating conditions constituting imminent danger to human life, and reversed to the extent that it imposes additional reclamation responsibility.

Affirmed in part, reversed in part.

McGRAW, Justice, concurring:

With unanimous agreement by the majority in Syllabus Point 2 that Eastern is responsible for abating any "imminent danger to *human life, property or environment*" associated with its slate dump dam on Low Gap Branch, I concur. The true measure of environmental quality is whether the native goldfinch can thrive in the air above the dump and the native brook trout[1] can thrive in the water below the

dam without accumulating poisonous substances which would endanger human health upon their consumption.[2] I do not accept the proposition implicitly advanced by the majority that reclamation, i.e., returning the site to its original grade, elevation, and contour, is impractical. The environmental integrity of this area, however, as this Court unanimously agrees, must be secured and preserved for today and tomorrow.

---

funds. This is a matter that can best be sorted out by the administrative agency entrusted with the authority to interpret and administer the state's reclamation statutes.

10. The intervenors live in Widen, Clay County. DNR filed an affidavit from the administrator of the West Virginia Abandoned Mine Lands program, which stated that money has already been received from the Secretary of Interior for coal refuse disposal impoundments at Widen in Clay County, Bear Wallow Branch in Logan County, and Benneth Run near Dola in Harrison County, and that these impoundments could have been eliminated 1984 but for the uncertainty as to continuing reclamation responsibility introduced by this case.

1. The utilization of animals for the protection of human health and safety is a time-honored tradition in the coal mining industry. George L. Kerr in his textbook, *Elementary Coal Mining* 178 (6th ed. 1921), noted that:

Detection of CO—Although this gas is inflammable, it cannot be detected by the flame of a lamp until there is about 12 per cent. present in the air, whereas a very small quantity is fatal to life. It has been suggested that as a very small percentage of this gas in the air

affects small warm-blooded animals; such as a mouse or a bird, these should be utilised in the detection of this gas.* One part of CO to a hundred parts of air will soon kill a bird. If the bird becomes quite helpless and unable to stand, it would be dangerous for a man to continue, even for a very short time, to breathe such an atmosphere.

* At a colliery in Fifeshire, where, owing to the presence of this gas, due to a gob fire, seven men lost their lives, a canary was afterwards used successfully in rescue work for detecting the presence of the gas. At another colliery mice are regularly kept for the detection of this gas, and it has now become a common custom to use either canaries or mice for this purpose. It is now compulsory to keep one or other of these small animals at the colliery for use, if required, to detect carbon monoxide.

2. It is widely accepted that fish can accumulate poisonous substances in their tissue which upon their consumption in the human food chain can lead to harmful consequences. *See, e.g., Warning Issued About Kanawha River Fish*, Charleston Daily Mail, March 4, 1986, at 7A, col. 4; *Return Fish to Kanawha, Moore Says*, Charleston Gazette, March 5, 1986, at 8B, col. 1.