ARTESIAN WATER COMPANY,
Appellant in No. 87–3622,

v.

The GOVERNMENT OF NEW CASTLE COUNTY, Defendant/Third–Party Plaintiff,

v.

LANDFILL, INC., a Delaware Corporation, Material Transit, Inc., a Delaware Corporation, Edgar Thomas Harvey, Edgar Thomas Harvey, Jr., W. Lawrence Knotts, Henry A. Twardus, William Q. Saienni, Elme D. Saienni, Salvatore J. Saienni, Dominic Cantera, Marian Cantera, Delaware Sand and Gravel Company, a Delaware Corporation, Anita Dell Aversano, individually and as Executrix of the Estate of Joseph Dell Aversano, Vincent Dell Aversano, Marcella Dell Aversano, Stauffer Chemical Co., a Delaware Corporation, Haveg Industries, Inc., a Delaware Corporation, Champlain Cable Corporation, a Delaware Corporation, Angelo Terranova, Stanley J. Twardus & Sons, Inc., a Delaware Corporation, and SCA Services, Inc., a Delaware Corporation, Third–Party Defendants,

ARTESIAN WATER COMPANY,

v.

The GOVERNMENT OF NEW CASTLE COUNTY, Defendant/Third–Party Plaintiff,

v.

LANDFILL, INC., a Delaware Corporation, Material Transit, Inc., a Delaware Corporation, Edgar Thomas Harvey, Edgar Thomas Harvey, Jr., W. Lawrence Knotts, Henry A. Twardus, William Q. Saienni, Elme D. Saienni, Salvator J. Saienni, Dominic Cantera, Marian Cantera, Delaware Sand and Gravel Company, a Delaware Corporation, Anita Dell Aversano, individually and as Executrix of the Estate of Joseph Dell Aversano, Vincent Dell Aversano, Marcella Dell Aversano, Stauffer Chemical Co., a Delaware Corporation, Haveg Industries, Inc., a Delaware Corporation, Champlain Cable Corporation, a Delaware Corporation, Angelo Terranova, Stanley J. Twardus & Sons, Inc., a Delaware Corporation, and SCA Services, Inc., a Delaware Corporation, Third–Party Defendants,

Appeal of NEW CASTLE COUNTY.

Nos. 87–3622, 87–3623.

United States Court of Appeals, Third Circuit.

Argued March 7, 1988.

Decided June 29, 1988.

Rehearing and Rehearing In Banc Denied July 26, 1988.

As Amended July 28, 1988.

Frank M. Thomas, Jr. (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., Thomas D. Whittington, Jr., Whittington & Aulgur, Coffee Run Professional Centre, Hockessin, Del., for Artesian Water Co.

George J. Weiner (argued), Michael A. Brown, William Roger Truitt, Patrick O. Cavanaugh, Mary Rose Kornreich, Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., B. Wilson Redfearn, Nancy E. Chrissinger, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for New Castle County.

Before WEIS, GREENBERG and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.[*]

On this appeal a private water utility seeks damages for the loss of potential withdrawals from artesian wells threatened by pollution from an adjacent landfill. The district court denied recovery except for the expense of monitoring the movement of the contamination leachate. We will affirm primarily on the ground that under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) the cause of action for damage to natural resources is generally restricted

---

[*] At the time of oral argument on this case, the Honorable Joseph F. Weis, Jr. was an active circuit judge. Since that time, Judge Weis has assumed senior status.

to governmental entities and is not available to private organizations.

The district court entered summary judgment in favor of plaintiff on its claim for monitoring expenses, granted summary judgment to defendant New Castle County on the remaining claims, and certified the judgments under Fed.R.Civ.P. 54(b), 659 F.Supp. 1269. Plaintiff appealed, and defendant cross-appealed.

Plaintiff, Artesian Water Company, is a privately-owned public utility that provides drinking water to the residents of New Castle County, Delaware. Artesian wishes to recover expenses incurred, and to be incurred, allegedly as a result of the release of hazardous substances from a neighboring landfill owned by the County of New Castle, one of the defendants. Plaintiff brings this suit for "costs of response" pursuant to CERCLA, 42 U.S.C. § 9607.

Artesian secures its water from wells located in the area it services. One of its primary sources is the Llangollen Wellfield in Delaware, which draws water from the productive Upper Potomac Aquifer, an underground sand formation through which water molecules pass under natural pressure into well casings. This groundwater system is not a series of underground streams or lakes, but consists of subterranean layers of sand which surface at various points and are fed by rainfall.

The water molecules move through the sand strata at a very slow rate—only a few feet per year—but the amount and direction can be altered by pumping activities. When an aquifer is pumped at a greater rate than it is recharged by precipitation, the natural water level will eventually drop below the top of the aquifer. This reduced hydraulic pressure can cause contaminants from other levels, as well as saltwater, to be drawn into the aquifer.

Artesian began developing the Llangollen Wellfield in 1946. By 1966, the company was withdrawing 1.62 million gallons per day ("MGD") and by 1969, was pumping 2.35 MGD. The state of Delaware, in the meantime, had enacted a regulatory scheme requiring prior governmental approval for any increase in groundwater withdrawal after July 1, 1966. Regulations, promulgated in 1969, established administrative procedures for approval of all increased pumping rates between 1966 and 1969. Significantly, Artesian did not make application and never obtained formal state approval for its augmented pumpage.

Despite the lack of prior governmental approval, Artesian continued to expand its operations in the Llangollen field. The company contends that by 1971 it had boosted its average daily rate to 3.85 MGD and had peaked at a withdrawal rate of 5.35 MGD.

In 1972, Delaware informed Artesian that ground water contamination had been discovered in the vicinity of the Llangollen Wellfield. In 1973, to prevent migration of the pollution, the state curtailed Artesian's withdrawals from that field, limiting the company to 2.0 MGD. In 1980, the state formally authorized Artesian to withdraw 2.0 MGD.

The most likely source of the contamination is the county's Army Creek Landfill located approximately 3,000 feet north-northeast of the Llangollen field. In the past, this site had been used as a solid waste disposal facility. Another inactive landfill, owned by the Delaware Sand and Gravel Company, sits several hundred feet to the east. It contains industrial and municipal waste. Both dumps appear on the EPA's National Priority List—a register compiled by the federal agency to rank the disposal sites posing substantial risks of danger to public health and welfare. The record before us does not establish whether the contamination originated solely at the county's landfill, Delaware Sand & Gravel's site, or at both.

By early 1974, the county had installed a containment system utilizing a network of wells adjacent to the Army Creek Landfill. Because of the nature of an aquifer supply system, contamination may be intercepted

before it reaches a "down stream location." By constructing a "ground water divide" that acts as a hydraulic barrier, the county has been able to stop the contamination from reaching Artesian's fields. To create this "barrier," however, the county must pump 2.0 MGD from the aquifer sands and then discharge the water via a purification process into the Delaware River. By removing this water before it migrates to the Llangollen Wellfield, the county essentially reduces the total potential gallonage Artesian conceivably could pump from the aquifer.

The containment system is effective because a balance is maintained between the amount of contaminated water the county withdraws "up gradient" and the water Artesian pumps "down gradient" of the dividing point. If Artesian were to pump to the full capacity of its equipment, that balance would be upset and contaminants probably would seep into the Llangollen Wellfield. For that reason, as well as the additional complication of possible salt water intrusion, the state continues to enforce the 2.0 MGD restriction on Artesian.

Since 1972, the county has spent more than $3.8 million designing, implementing, and operating programs to control the leachate from the dumps. Whatever its initial source, the leachate now extends no more than 300 feet from the county landfill and does not intrude into the area in which Artesian's wells are located.

Artesian has been able to provide adequate service to its customers despite the 2.0 MGD withdrawal rate, but claims to be damaged by denial of the opportunity to pump more water. Artesian's alleged losses are (1) costs of monitoring and evaluating the contamination's impact on Llangollen; (2) expense of equipment idled by the pumping restriction; (3) differential costs of temporary replacement water supplies; (4) costs of construction for an inter-connection with neighboring Chester Water Authority to obtain permanent replacement water supplies; and (5) present value of differential costs of purchasing permanent water supplies from the Chester Water Authority until 2008, the last year of the estimated useful life of the Llangollen Wellfield.

In 1976, Artesian filed suit in the Delaware Court of Chancery against New Castle County and other defendants, seeking damages and injunctive relief. The court held that under state law sovereign immunity prevented recovery for damages from the county, but that Artesian might be entitled to injunctive relief if the county had maintained a public or private nuisance. The Vice Chancellor denied the plaintiff's motion for summary judgment, finding that because of the limitation imposed by the state, Artesian did not have an absolute right to use water in excess of 2.0 MGD.

In view of the administrative regulations adopted in 1969 by the state's Water and Resource Commission, the Vice Chancellor concluded that usage rights exercised by Artesian in that year were "grand-fathered" so long as they amounted to a "reasonable use of the groundwater." Accordingly, if Artesian's use of 2.35 MGD during that period was reasonable, the utility need not have applied for formal approval. However, the state agency had never made a determination of reasonableness. The Vice Chancellor cautioned, "[t]he reasonable use may be of necessity restricted or even diminished should conditions not foreseen in 1969 require a diminution of plaintiff's reasonable use of the water in order to accommodate the right of others."

Because of the status of the record, the Vice Chancellor declined to rule whether the county could assert that, even though it had caused the contamination, its use of the ground water was reasonable and superseded the rights of the plaintiff. The Vice Chancellor observed that Delaware law does not create an absolute ownership right to groundwater; instead, the state adopts the "reasonable user" rule by which a right of use exists subject to government limitation. The right to use water thus constitutes a "recognizable property interest in the usufructuary rights to groundwater lying below [a landowner's] property." The Supreme Court of Delaware re-

fused to entertain an appeal on the sovereign immunity issue, and the Chancery Court case has remained dormant since that time.

In 1983, plaintiff brought the present CERCLA suit in the district court asserting that necessary "response" costs had been incurred and, as owner of the landfill, the county was strictly liable. The district court determined that the county's sovereign immunity was not a defense under CERCLA, but denied recovery because Artesian had not obtained prior governmental approval for the "response" action. *Artesian Water Co. v. Government of New Castle County*, 605 F.Supp. 1348 (D.Del.1985).

Soon after the district court filed its order, the EPA promulgated amendments to the National Contingency Plan, 42 U.S.C. § 9605, *as amended by* the Superfund Amendments and Reauthorization Act (SARA), Pub.L. No. 99–499, tit. I, § 105 (1986). These modifications obviated prior governmental approval of private party response, relying instead on compliance with applicable law to deter poorly planned cleanup actions, 40 C.F.R. §§ 300.68(f), 300.71 (1986).

Because the law had changed, the district court reconsidered issues which previously had no bearing on the outcome of its initial determination. Relying on the Chancery Court's preliminary rulings, the district court concluded that "in the narrow context of causation in a CERCLA action" the county, having caused contamination, would not be permitted to characterize its containment program as a reasonable competing use. On that rationale, Artesian had a protectable interest in withdrawing more than 2.0 MGD from Llangollen Wellfield. Nevertheless, the court decided that because CERCLA did not provide for economic loss, Artesian could not recover for any losses other than its monitoring and evaluation expenses. *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1286 (D.Del.1987).

The district court observed that CERCLA expressly referred to "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). On the facts presented, Artesian had properly incurred these expenses and need not have obligated itself to other response costs. The court denied the claim for idle equipment losses as unrecoverable economic loss.

Although both 42 U.S.C. §§ 9601(23) and (24) included "provision of alternative water supplies," the court held that Artesian's claim for approximately $10 million for temporary and permanent water supplies was inappropriate. According to the court, response costs of that nature may be recovered only when an existing water supply is either contaminated or threatened—circumstances which did not occur here.

As an alternative ground for its decision, the district court determined that consistency with the National Contingency Plan is an element of a plaintiff's prima facie case on liability, not a limitation on the amount of damages. Plaintiff had failed to satisfy the procedural requirements of the Plan—had not satisfactorily made investigation and feasibility studies, provided for public comments, demonstrated cost-effectiveness, or complied with appropriate standards. These deficiencies led the court to deny recovery for all claims except for costs of monitoring, an instance where the procedural requirements were not pertinent.

The court entered judgment in favor of the plaintiff and against New Castle County in the amount of $101,000 for monitoring expenses and against the plaintiff on its other claims. The judgments were certified under Fed.R.Civ.P. 54(b) and both parties appealed.

### I.

On appeal plaintiff argues that alternate water supply costs are compensable by CERCLA's specific terms and that, in effect, Artesian has been forced to contribute two-thirds of its water supply at Llangollen to the county's containment effort. Artesian further contends that the procedural requirements of the National Contingency

Plan were non-existent when the first containment steps were taken and, indeed, did not come into effect until 1985–86.

The county defendant advances the proposition that CERCLA is not a toxic tort recovery act, but rather a narrowly drawn statute focusing on the costs of remedying a hazardous site. The county, maintaining that it has undertaken this task successfully, objects to any recovery Artesian might receive under CERCLA for its purely economic losses and the monitoring expense.

## II.

### A.

■ CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage. Problems of interpretation have arisen from the Act's use of inadequately defined terms, a difficulty particularly apparent in the response costs area.

Section 9607(a)(4)(B) provides that a responsible party, defined in subsections (a)(1)–(4), shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." For present purposes, we may assume that New Castle County is a responsible party and that Artesian has a private right of action under the Act. The question before us, then, is whether the damages Artesian claims are cognizable "costs of response" which may be recovered.

The statute defines "response" as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). These terms explicitly include enforcement activities related to the cleanup effort.

In turn, "remove" means the "clean up or removal of released hazardous substances ... such actions as may be necessary to monitor, assess, and evaluate the release or threat of release ... or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare ... which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23).

The term "remove" includes, but is not limited to, "provision of alternative water supplies." *Id.*

The statutory term "remedy" designates those "actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). This definition also expressly includes "provision of alternative water supplies." *Id.*

The circuitous language of CERCLA reflects the statute's checkered legislative formulation. After a number of predecessor bills failed to muster sufficient support, a group of senators submitted the Stafford–Randolph compromise bill to a lame duck Congress in the waning days of the Carter Administration. That bill, however, did not receive careful study by a committee, and voting on the floor was controlled by a procedure that permitted no amendments, other than one previously cleared. The legislative history, therefore, furnishes at best a sparse and unreliable guide to the statute's meaning. *See* Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980*, 8 Colum.J.Envtl.L. 1 (1982) (describing CERCLA's legislative process).

However, some clarifications of CERCLA's scope and application have since emerged. In *Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986), the Supreme Court reviewed the legislative history and observed that the Act was not intended to compensate third parties for damage resulting from hazardous substance discharge. *Id.* at 375, 106 S.Ct. at 1115. The Court's conclusion finds support in Senate floor discussions preceding enactment of the compromise bill. At that stage, Senator Randolph acknowledged that several features of the unsuccessful bill, including compensation to victims, were needed. He conceded, however, that the final version of the legislation would have to settle for less in order to

expedite passage before the 96th Congress adjourned. One of the deliberate omissions in the compromise bill was reimbursement for property or income loss. Grad, *A Legislative History, supra,* at 21–22.

## B.

It is significant that the Act grants the right to assert claims for damages to natural resources only to governmental entities, not private persons. *See* 42 U.S.C. § 9601(16). Section 9607(f)(1) provides that liability for "an injury to, destruction of, or loss of natural resources under ... [this subsection is] to the United States Government, to any State for natural resources within the state or belonging to, managed by, controlled by, or appertaining to such State." [1] This natural resource limitation requires us to closely scrutinize the nature of Artesian's interest in the Llangollen Wellfield.

Delaware has established specific procedures to regulate the use of its water resources. The state's interest in water conservation was expressed in the General Assembly's declaration of policy that the "State, in the exercise of its sovereign power ... should control the development and use of the ... water ... resources of the State so as to effectuate full utilization, conservation and protection of the water ... resources of the State." Del.Code Ann. tit. 7 § 6001(b)(2) (1983). The state legislature made findings on the control of Delaware's water resources:

"(2) The development and utilization of ... water ... resources must be regulated to ensure that the ... resources of the State are employed for beneficial uses and not wasted;

.   .   .   .   .

(5) The ... water ... resources of the State must be protected from pollution in the interest of the health and safety of the public; ...

(6) The ... water ... resources of the State can best be utilized, conserved and protected if utilization thereof is restrict-

ed to beneficial uses and controlled by a state agency ..."
*Id.* § 6001(a)(2), (5), (6).

To carry out these general policies, the state created the Delaware Water and Air Resources Commission, later functioning under the designation of the Department of Natural Resources and Environmental Control. The agency is empowered to "approve the allocation and use of water in the State on the basis of equitable apportionment," Del.Code Ann. tit. 7 §§ 6104(b)(3) (Supp.1970), and to approve all new plans and designs of all "water facilities of all water resources by any ... public or private water user within the State." *Id.* § (b)(4). Moreover, "[a]fter July 1, 1966, no increase in the amount of water used shall be made by a Delaware user without prior approval of the Department of Natural Resources and Environmental Control." *Id.* § 6105(a).

## III.

As noted earlier, although administrative regulations implementing the statutory authorization have carved out a limited "grandfathering exemption," Artesian never sought or received agency action on that provision. In 1972, when Artesian applied for an allocation permit covering five replacement wells in the Llangollen Wellfield, the Delaware Department of Natural Resources disclosed the evidence of contamination. The following year, the Department directed the company to limit withdrawals to 2.0 MGD.

In 1980 and 1985, the Department allotted to Artesian 2.0 MGD from Llangollen Wellfield pursuant to Del.Code Ann. tit. 7, § 6010(f)(1). Thus the maximum amount of gallonage ever formally or specifically authorized by the state agency to Artesian remains 2.0 MGD. The plaintiff's claim to a greater amount rests on its physical ability to pump more and the fact that it did withdraw more without state permission before 1972.

---

1. This section was changed by CERCLA amendments in 1986 in aspects other than the quoted language.

In the state court suit, the Vice Chancellor concluded that plaintiff had a recognizable property interest to use groundwater subject to state regulation and diminution. Different issues, however, are present in state court and the district court even though both cases arise from the same events and assert identical losses. The state court case must be distinguished from the federal suit because CERCLA's scope is far more narrow than common law causes of action.

The district court recognized that CERCLA regards the aquifer as a natural resource whose injury gives the state a cause of action. Nonetheless, the court reasoned that natural resource damage and remedial action by a private party occasionally may overlap. Although that may be true in some instances, we do not see an overlapping claim here.

A few basic points must be kept in mind. First, Artesian never received approval to pump more than 2.0 MGD. Second, Artesian's wells have not been contaminated, and the 2.0 MGD have enabled the utility to adequately serve its customers. Third, the extent of Artesian's interest in the 2.0 MGD authorized by the state need not be decided here because we are persuaded that gallonage over that amount is a natural resource belonging to Delaware. Artesian possesses no unqualified right to that water; at best, the plaintiff's interest is little more than a mere expectancy.

Perhaps Artesian could successfully establish injury to its natural resources expectancy in the cause of action in state court. In CERCLA, however, Congress provided specifically that sums recoverable for injury to natural resources shall be used by the state "to restore, rehabilitate, or acquire the equivalent of such natural resources [only] by the ... State government." 42 U.S.C. § 9607.[2]

Congress understood that tremendous sums would be needed to adequately solve the national contamination problem. Indeed, the enormous potential for damage recovery was one of the principal reasons for the congressional stalemate that prevented passage of Superfund's predecessor bills. Despite its uncertainties, CERCLA's compromise represents a serious effort to reconcile important policy differences between the House and the Senate. By eliminating economic loss to victims and emphasizing cleanup costs, Congress tried to limit liability—at least until further experience might lead to appropriate modification of the Act. The whole tenor of the legislation is out of harmony with an interpretation that would allow the state to recover for destruction of an aquifer and, at the same time, permit plaintiff to recover for the loss of water from that source. Such a necessarily duplicative recovery is inconsistent with CERCLA.[3]

Although Artesian may have suffered economic loss compensable under state law, under CERCLA injury to, or replacement of, the aquifer, at least to any extent beyond 2.0 MGD, is the state's cause of action—not Artesian's.

Our conclusion is further bolstered by Congress' decision to provide that, in a suit for injury to a loss of a natural resource, "[t]here shall be no recovery ... where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly [before the enactment of this Act on] December 11, 1980." 42 U.S.C. § 9607(f). Only in the limited context of natural resource loss did Congress specifically address the difficult question of CERCLA's retroactivity. Because injury to a natural resource might result in staggering claims, Congress purposely did not impose retroactive liability for such losses.

When CERCLA became effective in December 1980, Artesian was not yet operating under its initial formal authorization of 2.0 MGD. To allow its claim for alterna-

---

**2.** The word "only" was added by the 1986 amendments.

**3.** In the 1986 amendment, Congress added the following sentence to section 9607(f): "There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource."

tive water supplies in excess of 2.0 MGD based on pre-CERCLA gallonage pumped without state permits would not only duplicate recovery for a natural resource, but would also award it retroactively. That outcome would frustrate the express congressional ban on that type of claim.

Thus, the specific non-retroactivity of a natural resources claim is another indication that Congress intended to limit such claims both as to time and eligibility for recovery. There is, therefore, no justification for an expansive reading of CERCLA in these circumstances.

## IV.

Plaintiff cites explicit language listing alternative water supplies among the statute's appropriate remedial measures. We do not find that argument persuasive.

CERCLA's poor draftsmanship is evident in the Act's failure to differentiate between costs expended by private parties and those by governmental bodies. Surely, if a municipal water supply is imminently threatened—as was the Atlantic City water supply in *United State v. Price*, 688 F.2d 204 (3d Cir.1982)—a governmental body may, and should, act decisively to obtain alternative water supplies in order to abate the public's exposure to health risks. In that case, recovering costs of an alternate water supply from the responsible parties would be a necessary expense in preventing potentially serious consequences of a hazardous substance leak.

That situation differs from the one presented here where the county has taken successful measures to contain the leachate. This plaintiff's claim is one by a private corporation hoping to tap a potential water source not needed to meet current demand.

To summarize, we conclude that Artesian does not have a claim for alternative water supplies under CERCLA for any gallonage in excess of the 2.0 MGD approved by Delaware. We do not imply, however, that such a right of action would exist if the 2.0 MGD supply would be reduced by direct contamination. We leave that issue for another day.

## V.

It follows that the provision of additional water sources sought by Artesian is not a remedial cost "as may be necessary" in the statutory language. In these circumstances, the district court concurred with the EPA's conclusion that "'to replace an, as yet, uncontaminated source of drinking water' would be unjustified." *Artesian*, 659 F.Supp. at 1290. We agree with the district court both in this assessment and in its comment that pumping "capacity to reach contaminated groundwater ... does not justify provision of [an alternative water supply] in the absence of a threat to Artesian's current water supply." *Id.* at 1289. On this alternative ground as well, we will affirm the district court's denial of Artesian's claim to alternative water supplies.

## VI.

■ The district court granted judgment on Artesian's claims for costs incurred in monitoring and evaluating the impact of the leachate on the Llangollen Wellfield. The county argues that plaintiff may not recover preliminary expenses because it has not incurred other compensable response costs. In its brief, the county also contends that these activities were to some extent duplicated by the state's efforts. Relying on *Wickland Oil Terminals v. Ascaro, Inc.*, 792 F.2d 887 (9th Cir.1986), the district court found that these expenses were recoverable under 42 U.S.C. § 9607(a)(2)(B). We agree with this determination.

Because Artesian has state approval to extract 2.0 MGD, we hold that its monitoring endeavors were suitable to ensure that the source of its supply, at least to that amount, remained uncontaminated. We find nothing in CERCLA requiring Artesian to rely solely on the state's preliminary measures, rather than to make its own appraisal.

The judgments of the district court on the motions for summary judgment will be affirmed. The case will be remanded to

the district court for resolution of the remaining issues.