215 F.3d 321 (2nd Cir. 2000)
 COMMANDER OIL CORP., Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,
v.
BARLO EQUIPMENT CORP., Defendant-Appellant-Cross-Appellee,
ADVANCE FOOD SERVICE EQUIPMENT ET AL., Defendants-Counter-Claimants,
JACKSON STEEL PRODUCTS, INC. and SLATER ELECTRIC, INC., Defendants-Counter-Claimants-Third-Party Plaintiffs,
DIE MATIC PRODUCTS, INC., Defendant-Cross-Claimant,
M.V. BARMED, INC. and JACKSON ACQUISITION CORP., Third-Party Plaintiffs,
JOHN J. BERNANSKY ET AL., Third-Party Defendants,
AMPEREX ELECTRONIC CO. ET AL., Defendants,
ROBERT PASLEY and PASLEY SOLVENTS & CHEMICALS, INC., Defendants-Cross-Defendants.
 Docket Nos. 98-7975(L), 98-9075(xap)
August Term 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued October 19, 1999
Decided: June 12, 2000
 
 Appeal and cross-appeal from a judgment of the United States District Court for the Eastern District of New York (Jacob Mishler, J.), imposing CERCLA liability on Barlo Equipment Corp. as an "owner" within the meaning of 42 U.S.C. §9607(a)(1) because of its status as a sublessor of contaminated property; apportioning liability on that basis; granting Barlo leave to amend its answer to plead a statute of limitations defense; and granting Barlo's partial summary judgment motion on Commander Oil's state-law claims. We hold that Barlo is not an "owner" within the meaning of CERCLA and therefore REVERSE the judgment of the district court to the extent that it was in Commander Oil's favor; otherwise, we AFFIRM the judgment of the district court.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 DAVID JACOBY, ESQ., MARTIN B. WASSER, ESQ., DANIEL KOLKO, ESQ., Phillips Nizer Benjamin Krim & Ballon LLP, New York, N.Y., (J. DAVID MACCARTNEY, Jr., ESQ., MacCartney, MacCartney, Kerrigan & MacCartney, Nyack, New York, on the brief) for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.
 ANDREW J. SIMONS, ESQ., Farrell Fritz, P.C., Uniondale, New York, for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.
 Before: WALKER, CABRANES, and KATZMANN, Circuit Judges.
 JOHN M. WALKER, Jr., Circuit Judge:
 
 
 1
 This dispute requires us to decide whether the lessee of a 75' X 250' parcel of land in Uniondale, New York, may be held liable as an "owner" for purposes of allocating the costs of remediation imposed by the Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 ("CERCLA").
 
 
 2
 Defendant Barlo Equipment Corp. ("Barlo") appeals from a judgment of the United States District Court for the Eastern District of New York (Jacob Mishler, Judge), finding it liable under CERCLA to plaintiff Commander Oil Corp. ("Commander Oil") as an "owner" of the parcel by virtue of its status as the parcel's lessee/sublessor. Although we conclude that a lessee may, under some circumstances, be held liable under CERCLA as an "owner," we conclude that, under the circumstances of this case, Barlo was not an "owner" within the meaning of CERCLA. Accordingly, we reverse the judgment of the district court in substantial part.[1]
 
 BACKGROUND
 
 3
 In 1963, Commander Oil became the owner of two lots in Nassau County, lots 7A and 7B, after Commander Oil merged with Lawrence J. Bennett, Inc., the lots' record owner. Lot 7A contained office and warehouse space; 7B, the parcel at issue in this case, housed twelve above-ground petroleum storage tanks and was used by Commander Oil as a fuel depot and "throughput" facility at least until 1967. In 1964, Commander Oil leased the office and warehouse space on lot 7A to Barlo, which was in the business of buying, manufacturing, and distributing petroleum-handling equipment. In 1969, Commander Oil leased lot 7B to Pasley Solvents & Chemicals, Inc. ("Pasley"), which used the site to repackage solvents purchased in bulk and to reclaim and revitalize used solvents. Under Pasley's lease, Commander Oil retained the use of three oil storage tanks on lot 7B.
 
 
 4
 The arrangement at the heart of the present dispute arose in 1972 when Commander Oil consolidated its leases. Under a single new lease, Commander Oil rented both lots 7A and 7B to Barlo, which in turn subleased 7B to Pasley. This arrangement simplified Commander Oil's bookkeeping and also delegated responsibility to Barlo for basic maintenance and payment of taxes on both lots. The nature of the sublease from Barlo to Pasley is fiercely contested. Barlo characterizes itself simply as a rent conduit and the lease and sublease of 7B as a bookkeeping measure implemented entirely at Commander Oil's behest. Barlo claims that the new arrangement did not change the actual relationship between the three parties and that Pasley continued to treat Commander Oil as its lessor. Commander Oil paints a substantially different picture, referring to instances of Barlo's alleged involvement with Pasley's activities on 7B, and to the fact that Barlo derived a profit, albeit a small one, from the sublease arrangement. We need not resolve this dispute, however, because it does not affect the legal result.
 
 
 5
 In 1981, an investigation by the Nassau County Department of Health ("DOH") led to the discovery of contamination on lot 7B. The DOH referred the matter to the New York State Department of Environmental Conservation, which charged Pasley in Nassau County District Court with violating the Nassau County Fire Prevention Ordinances. Pasley agreed to drain its tanks, remove solvents it had stored on the lot, and vacate the premises.
 
 
 6
 Six years later, the EPA ordered Commander Oil to conduct an investigation and a feasibility study to determine the extent of the contamination and to propose a plan for its remediation. In 1995, the EPA sought reimbursement from Commander Oil and other defendants for response costs incurred by the federal government in remediating the site. On January 26, 1996, Commander Oil and other defendants entered into a consent decree in which "Commander agreed to design and implement response actions at the site and to reimburse the United States for past and future response costs incurred in connection with the Site." (Consent Decree ¶ 20). In turn, Commander Oil received contribution for these costs from certain defendants, who ultimately settled for $1,849,127.91.
 
 
 7
 In 1990, Commander Oil filed this action, demanding contribution or indemnification for additional costs from Barlo and Pasley. Commander Oil's complaint seeks, inter alia, indemnification or contribution under CERCLA, contractual indemnification, and damages for various state-law claims including trespass, negligence, nuisance, and waste.
 
 
 8
 On June 12, 1997, the district court granted partial summary judgment to both Commander Oil and Barlo. For purposes of establishing CERCLA liability, the only contested issue was whether Barlo was an "owner" within the meaning of 42 U.S.C. § 9607(a)(1). The district court held that Barlo was an owner within the meaning of §9607(a)(1) by virtue of its "authority and control" over lot 7B. In so holding, the district court implicitly rejected Barlo's argument that "owner" in §9607(a)(1) means "record owner" and instead ruled that "a lessee who has control over and responsibility for the use of the property is the owner of the property" for CERCLA purposes. The district court also denied Commander Oil's claims for contractual indemnification, permitted Barlo to amend its answer in order to plead a statute of limitations defense to Commander Oil's various state-law claims, and, in the same order, dismissed the claims as time barred.
 
 
 9
 The district court subsequently held a bench trial to apportion liability as between Barlo, Commander Oil, and Pasley. Following trial, the district court ruled that although Pasley was responsible for all response costs, the costs had to be allocated between Commander Oil and Barlo because Pasley was "financially irresponsible." The district court rejected Commander Oil's request for full indemnification from Barlo under CERCLA on the ground that Commander Oil was not an "innocent landowner" within the meaning of 42 U.S.C. §9607(b)(3). Nevertheless, the district court ruled that Commander Oil could recover 25% of its costs from Barlo under 42 U.S.C. §9613(f)(1). Accordingly, the district court entered judgment against Barlo in the amount of $802,915 plus 25% of "any future restoration costs."
 
 
 10
 Barlo appeals from that judgment, arguing that its status as a lessee/sublessor did not make it an "owner" within the meaning of CERCLA and that the district court's apportionment of liability was clearly erroneous. Commander Oil cross-appeals claiming that the district court erred in dismissing its claims for contractual indemnification and in permitting Barlo to amend its pleadings to assert a statute of limitations defense to Commander Oil's state-law causes of action.
 
 DISCUSSION
 
 11
 We are called upon in this case to resolve yet another ambiguity within CERCLA's miasmatic provisions. CERCLA creates a regime of broad-ranging liability, permitting the government to recover its remediation expenses directly from parties responsible for pollution, see 42 U.S.C. § 9607(a)(4)(A), and authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats, see 42 U.S.C.§9607(a)(4)(B). CERCLA creates various categories of potentially responsible parties, one of which is pertinent to this case: owners and operators of facilities. See 42 U.S.C. §9607(a)(1); B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992) (delineating potentially responsible parties as: "past and present owners or operators of facilities, transporters of hazardous substances, and those . . . who generate or arrange for the disposal or treatment of hazardous substances"). Absent a showing that one of CERCLA's affirmative defenses applies, liability for owners and operators is strict. See B.F. Goodrich, 958 F.2d at 1198.
 
 
 12
 Commander Oil's suit against Barlo seeks either contribution or indemnification for the costs it has and will continue to incur under its consent decree with the EPA. The district court granted partial summary judgment to Commander Oil for contribution on the theory that Barlo, as a lessee/sublessor, was an "owner" of lot 7B and was therefore strictly liable. 2 Other courts to have considered whether lessees/sublessors are owners for purposes of CERCLA's strict owner liability provisions have reached the same conclusion on similar facts. See, e.g., Delaney v. Town of Carmel, 55 F. Supp. 2d 237, 258-59 (S.D.N.Y. 1999) ("[T]he owner of a leasehold of a CERCLA facility may be liable as an owner of that facility."); United States v. A & N Cleaners & Launderers, Inc., 788 F. Supp. 1317, 1332-34 (S.D.N.Y. 1992); United States v. South Carolina Recycling & Disposal, Inc., 653 F. Supp. 984, 1002-03 (D.S.C. 1984), aff'd in part, vacated in part sub nom. United States v. Monsanto Co., 858 F.2d 160 (4th Cir. 1988). Essentially, these courts have interpreted the term "owner" to extend beyond the fee or record owner to anyone possessing the requisite degree of control over the property. Whether, and under what circumstances, a lessee/sublessor may be held liable as an owner for CERCLA purposes is a question of first impression in this circuit and we review the district court's legal conclusions de novo. See Maguire v. Citicorp Retail Servs., Inc., 147 F.3d 232, 235 (2d Cir. 1998).
 
 I.
 
 13
 CERCLA's text offers no helpful guidance for interpreting the extent of owner liability. According to the statute: "The term 'owner or operator' means . . . any person owning or operating [a] facility." 42 U.S.C. §9601(20)(A). We are thus required to give content to a statutory tautology, a position to which we have become increasingly accustomed in the environmental context. Nor are we the first court to have recognized that CERCLA is hardly a model of legislative clarity. See, e.g., Exxon Corp. v. Hunt, 475 U.S. 355, 363 (1986); Artesian Water Co. v. New Castle County, 851 F.2d 643, 648 (3d Cir. 1988) ("CERCLA is not a paradigm of clarity or precision. It has been criticized frequently for inartful drafting and numerous ambiguities attributable to its precipitous passage.").
 
 A.
 
 14
 Our statutory interpretation is guided by CERCLA's few well-established principles. "Because it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties [potentially] responsible for the releases liable for the costs of the cleanup." B.F. Goodrich, 958 F.2d at 1198. The scheme envisioned by Congress protects taxpayers generally from bearing the costs of nationwide cleanup. See id. Instead, potentially responsible parties must shoulder the frequently heavy burden of environmental liability. Potentially responsible parties are not limited to parties who were the cause in fact of the contamination, see New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir. 1985) ("[S]ection 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation."), but neither does CERCLA automatically assign liability to every party with any connection to a contaminated facility. A recent Supreme Court decision demonstrates the difficulty of determining the limits of CERCLA's strict liability provisions.
 
 
 15
 In United States v. Bestfoods, 524 U.S. 51 (1998), the Court was called on to construe operator liability and decide "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." Id. at 55. The contested issues in Bestfoods concerning corporate law and operator liability do not control the instant dispute. However, the Court faced a similar interpretive task and we find its approach useful here.
 
 
 16
 We therefore begin our analysis of the term "owner" in §9607(a) by doing "the best we can to give the term its ordinary or natural meaning." Bestfoods, 524 U.S. at 66 (internal quotation marks omitted). But unlike "operator," the term "owner" has no natural meaning that can resolve the present dispute. Barlo urges that CERCLA's owner liability is restricted to record owners. Commander Oil argues for a more expansive definition that relies primarily on the right to control property, whether the right is possessory or is a recorded property interest. Neither position is obviously implausible. According to Webster's dictionary, an owner is "[O]ne that has the legal or rightful title whether the possessor or not." Webster's Third New International Dictionary of the English Language Unabridged 1612 (1981). Black's Law Dictionary, however, equivocates between titular and possessory owner, defining an owner variously as "[o]ne who has the right to possess, use, and convey something," and as "[o]ne who has the primary or residuary title to property." Black's Law Dictionary 1130 (7th ed. 1999). This definition's ambiguity comes as no surprise. Long-standing scholarship has informed us that ownership -- and its attendant concept 'property' -- has limited inherent content. See, e.g., Wesley Newcomb Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning and Other Legal Essays 96 (Walter Wheeler Cook ed., 1923) (stating that property "consists of a complex aggregate of rights (or claims), privileges, powers, and immunities").
 
 
 17
 Courts and commentators have supplied no consistent guidance as to which rights in the proverbial property bundle define ownership. Compare, e.g., Hodel v. Irving, 481 U.S. 704, 716 (1987) (stating that "the right to pass on property to one's family in particular" constitutes a protected property right under the Fifth Amendment), with Andrus v. Allard, 444 U.S. 51, 65-66 (1979) (holding that abrogating the right to sell endangered eagles' feathers did not implicate the Fifth Amendment); see also William A. Fischel, Introduction: Utilitarian Balancing and Formalism in Takings, 88 Colum. L. Rev. 1581, 1590-94 (1988) (reviewing various commentators' disagreements over the content of protectable property interests). Our task today is less theoretical yet is still grounded in the same basic controversy over defining ownership. Its manifestation in this case is whether, and under what circumstances, the rights possessed by a lessee are sufficient to rise to the level of "ownership" for CERCLA purposes.
 
 
 18
 Most of the district courts that have considered this question have held that site control is a sufficient indicator of ownership to impose liability on lessees or sublessors. See, e.g., Castlerock Estates, Inc. v. Estate of Markham, 871 F. Supp. 360, 367 (N.D. Cal. 1994); Burlington N. R.R. Co. v. Woods Indus., Inc., 815 F. Supp. 1384, 1391-92 (E.D. Wash. 1993); Pape v. Great Lakes Chem. Co., No. 93 C 1585, 1993 WL 424249, at *3 (N.D. Ill. Oct. 19, 1993); see also, e.g., Delaney, 55 F. Supp. 2d at 258-59 ("[T]he owner of a leasehold interest in a CERCLA facility may be liable as an owner of that facility, as long as the lessee exercised sufficient site control to place it in the shoes of owners.") (internal quotation marks omitted); A & N Cleaners & Launderers, Inc., 788 F. Supp at 1333 ("The undisputed facts establish that [the sublessor] exercised a degree of site control over the Property, that . . . confers ownership status upon it for purposes of CERCLA . . . ."); South Carolina Recycling & Disposal, Inc., 653 F. Supp at 1003 ("[The lessee] maintained control over and responsibility for the use of the property and, essentially, stood in the shoes of the property owners."). The reasoning of these district courts is not without its appeal; if the lessee is the active user and polluter of the property, imposition of CERCLA liability seems particularly appropriate. But, while the imposition of liability in such a situation is surely correct, imposing owner liability instead of operator liability threatens to conflate two statutorily distinct categories of potentially responsible parties.
 
 
 19
 It is settled in this circuit that owner and operator liability should be treated separately. See, e.g., Schiavone v. Pearce, 79 F.3d 248, 254 (2d Cir. 1996) ("Observing that 'owner' liability and 'operator' liability denote two separate concepts, courts stress the disjunctive character of CERCLA liability." (internal quotation marks omitted)); cf. Bestfoods, 524 U.S. at 64 ("If the act rested liability entirely on ownership of a polluting facility, this opinion might end here; but CERCLA liability may turn on operation as well as ownership . . . ."). Even a cursory examination of the basis for operator liability reveals that it would be almost entirely subsumed by owner liability that relied on site control analysis. As the Supreme Court recently explained, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Bestfoods, 524 U.S. at 66-67. If control over a facility could establish ownership then operator liability in these circumstances would be just a subset of owner liability. Imposing owner liability on the basis of site control threatens to make owners of all operators and surplusage of most of operator liability. See Castlerock, 871 F. Supp at 367 ("The test for 'ownership' liability under CERCLA . . . has become similar to [the] test for 'operator' liability under CERCLA."). Because we strive to avoid redundancy in our interpretation of statutes, see, e.g., Exxon Corp., 475 U.S. at 369-70, we believe that site control alone is an improper basis for the imposition of owner liability. Lessees may frequently be liable as operators but most lessees are not owners within the meaning of § 9607(a).
 
 B.
 
 20
 While the typical lessee should not be held liable as an owner, there may be circumstances when owner liability for a lessee would be appropriate. Some district courts, for example, have treated lessees as owners for CERCLA purposes when they sublet the premises to other entities. See, e.g., South Carolina Recycling & Disposal, Inc., 653 F. Supp at 1003 ("The fact that during part of its leasehold [the lessee] sublet a portion of the site does not diminish its responsibility. If anything, it strengthens the case [against the lessee]."). These courts have reasoned that a sublessor, by virtue of its relationship to the sublessee, will often be in the best position - or at least in a better position than the record owner - to prevent pollution at a facility. However, this reasoning improperly emphasizes the relationship between the lessee/sublessor and the sublessee, instead of the relationship between the owner and the lessee/sublessor.
 
 
 21
 Ownership has consistently defied easy definition across a variety of legal contexts, but we know at least that it is relational. See Restatement (First) of Property ch. 1 intro. note (1936) ("[Property comprises] legal relations between persons with respect to a thing."). Ownership exists vis-a-vis someone else; it represents a priority of rights and claims and not a concrete status. Lessees/sublessors necessarily have relationships with both the original lessor - often the record owner - and the sublessee. A lessee/sublessor has many of the rights and obligations of ownership in relation to the sublessee; he usually retains, interalia, the power to lease, to exclude, and to govern the terms of property's use. But lessees/sublessors are simply lessees in relation to the original owner/lessor, incapable of granting to a sublessee more than they originally acquired from their lessor. Since a typical lessee is not liable as an owner, then logically a sublessor should not be liable either, unless its status with regard to the sublessee operates somehow to confer owner liability. However, we find no basis in CERCLA for supposing that the relationship between the sublessor and sublessee is the critical relationship for identifying owner liability and therefore no principled basis for assuming that a lessee/sublessor's relationship with a sublessee automatically transforms the lessee/sublessor into an owner under § 9607(a). In fact, there are good reasons why this relationship cannot be dispositive for purposes of establishing strict owner liability.
 
 
 22
 Strict liability is a narrowly tailored tool, capturing a specific kind of responsibility. CERCLA's admittedly disjointed legislative history offers some useful insights into the congressional purposes motivating strict owner liability. Cf. Shore Realty Corp., 759 F.2d at 1039 (stating that "CERCLA's history reveals as much about the nature of the legislative process as about the nature of the legislation," but nevertheless finding important guidance from the Act's history). The report of the Senate Committee on Environment and Public Works justified CERCLA's imposition of strict liability in part by referring to the English case of Rylands v. Fletcher, L.R. 3 H.L. 330 (1868). See, e.g., S. Rep. No. 96 848, at 33 (1980), reprinted in 1 Legislative History of the Comprehensive Response, Compensation, and Liability Act of 1980 (Superfund), Public Law 96-510, at 305, 340 (1983) [hereinafter "CERCLA Legislative History"]. The reference is instructive. The principle enunciated in Rylands v. Fletcher has been succinctly stated by this court in United States v. FMC Corp., 572 F.2d 902, 907 (2d Cir. 1978): "When one enters into a business or activity for his own benefit, and that benefit results in harm to others, the party should bear the responsibility for that harm." Central to the Rylands v. Fletcher theory of strict liability is the underlying fairness of imposing on the beneficiaries of an ultra-hazardous activity the ultimate costs of that activity. The Senate Committee wrote: "To establish provisions of liability any less than strict, joint, and several liability would be to condone a system in which innocent victims bear the actual burden of releases, while those who conduct commerce in hazardous substances which cause such damage benefit with relative impunity." 1 CERCLA Legislative History, supra at 320. CERCLA's strict owner liability, therefore, can be justified in part on the grounds that owners - even as lessors - derive benefit from the activities conducted on their property.
 
 
 23
 The same justification for strict liability does not necessarily or automatically apply to lessees/sublessors, as the facts of the present case make clear. The arrangement that led to Pasley's contamination of the site was between Commander Oil and Pasley, not between Pasley and Barlo. The terms of the original lease between Pasley and Commander Oil were set before Barlo was interposed as a sublessor. Commander was a sophisticated lessor and fully capable of including in the price of the lease the risk of Pasley contaminating the site. As we explain in part II of this opinion, infra, owner liability might attach to a sophisticated lessee/sublessor who exploits unanticipated risks on the property of an unsophisticated owner. But here, and in the normal course of events, such liability will not attach to lessees/sublessors.
 
 
 24
 There is an additional policy reason supporting our conclusion that owner liability should not automatically apply to lessees/sublessors. When buyers are considering purchasing property they will usually conduct an environmental assessment prior to closing. CERCLA has raised the costs of owning polluted land, and owners and potential owners are on notice of their liability and are wise to ensure that a potential acquisition is not encumbered by massive environmental liability. So far as we are able to discern, the same is not true of lessees/sublessors. A lessee/sublessor's concern about environmental hazards on a site will usually be limited to ensuring "that the property is adequate for the tenant's purposes and that there are no on site environmental conditions or features which would impair the tenant's ability to operate." Richard D. Jones & Ivan S. DeVoren, Managing Environmental Risks in Commercial Real Estate Leases, SA81 ALI-ABA 121, 126 (1996). We are reluctant to surprise Barlo with new and unexpected liability, and to undermine the security of lessees/sublessors throughout the circuit who have entered into subleases before this decision.
 
 II.
 
 25
 We do not foreclose the possibility that in some circumstances lessees/sublessors may be liable as owners under CERCLA. Certain lessees may have the requisite indicia of ownership vis-a-vis the record owner to be de facto owners and therefore strictly liable. Such would probably be true of a lessee with the proverbial 99-year lease. While we need not define with specificity those factors that might transform a lessee into an owner, we note several that we think could be important, specifically: (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs. This non-exclusive list is meant to reinforce the point that the critical question is whether the lessee's status is that of a de facto owner and not whether it exercises control over the facility. Cf. Bedford Affiliates v. Sills, 156 F.3d 416, 425 (2d Cir. 1998) (noting that the innocent owner exception to liability is premised on an entity's status and not on its participation in activities relating to contamination). Moreover, the critical relationship is that between the lessee/sublessor and the owner/lessor, not that between the lessee/sublessor and the sublessee.
 
 
 26
 For example, sale-leaseback arrangements may not serve to insulate the former-owner/lessee from owner liability if the lessee actually retains most rights of ownership with respect to the new record owner. See[2] Powell on Real Property § 17A, at 3 (1997) ("[T]he tenant's position as to use and occupancy and responsibility for operating expenses does not differ, from a practical standpoint, from the position that the tenant occupied as owner prior to sale."). Likewise, extremely long-term leases may create owner liability in the lessee if, according to the terms of the lease, the lessee retains so many of the indicia of ownership that he is the de facto owner. And owner liability might also lie where a lessee/sublessor has impermissibly exploited - by use himself or through a sublease - more rights than he originally leased, effectively expropriating from the owner the right to benefit from activity on the property.
 
 
 27
 Applying these principles to the case at hand, we conclude that the district court erred in holding Barlo strictly liable as an owner pursuant to 42 U.S.C. §9607(a)(1). Whether or not Barlo was simply a rent conduit between Commander Oil and Pasley - as Barlo claims - it did not possess sufficient attributes of ownership over lot 7B. By the terms of the lease between Barlo and Commander Oil, Barlo was, inter alia, (1) limited to using lot 7A, and only "for that business presently conducted by tenant on a portion of the same premises leased hereunder"; (2) required to obtain written consent from Commander Oil before making "any additions, alterations or improvements" on the land, which alterations would become Commander Oil's property in any event; (3) required to obtain written approval from Commander Oil to sublet the property, and prohibited from subletting to any entity that had "any connection with the fuel, fuel oil or oil business"; (4) required to obtain written permission from Commander Oil to display any "sign, advertisement, notice or other lettering" on the building; (5) required to keep the property "clean and in order to the satisfaction of" Commander Oil, and responsible for any damage Barlo itself caused to the premises or to the "systems or equipment or any installation therein"; and (6) prohibited from doing anything that would "in any way increase the rate of fire insurance" on the property, and from bringing or keeping upon the premises "any inflammable, combustible or explosive fluid, chemical or substance." In addition, the lease was limited to a five-year term with one option for renewal.
 
 
 28
 Moreover, Commander Oil retained many of the rights and obligations of ownership. Among other things, the fuel company: (1) reserved a right to enter onto the lot for various purposes; (2) reserved for its own use three oil storage tanks on lot 7B; (3) reserved an "option" to use, on written notice to Barlo, "certain office space" within lot 7A; (4) reserved the right to maintain "its aerial or a comparable aerial" on the roof of the building; and (6) assumed responsibility to make structural repairs.
 
 
 29
 To be sure, Barlo possessed some attributes of ownership with respect to lot 7B. For instance, Barlo was obligated to secure insurance for the property, was liable to Commander Oil for all assessments on the property and any increases (but only increases) in taxes, and assumed responsibility for all nonstructural repairs, including "all repairs to heating, plumbing and lighting fixtures and equipment; cesspool maintenance, repair and replacement; snow removal; driveway, parking area and pavement repairs, etc." Notwithstanding these attributes, however, Barlo lacked most of the bundle of rights that comes with ownership of property. Accordingly, it may not be held liable under CERCLA as an owner, and the judgment of the district court is reversed to the extent that it imposed liability against Barlo for the contamination on lot 7B.[3]
 
 III.
 
 30
 Commander Oil has cross-appealed on two grounds: that the district court erred by refusing to grant Commander Oil indemnification as opposed to contribution; and by permitting Barlo to amend its answer to plead a statute of limitations defense to Commander Oil's state-law claims. We disagree.
 
 
 31
 Commander Oil argues first that it should be entitled to indemnification pursuant to 42 U.S.C. § 9607(a)(4)(B). However, we have previously held that potentially responsible parties may pursue only contribution claims against other potentially responsible parties and may not seek indemnification. See Bedford Affiliates, 156 F.3d at 423-24. In an effort to circumvent the rule of Bedford Affiliates, Commander Oil argues, contrary to the district court, that it was entitled to an "innocent owner" defense and thus was not a potentially responsible party. We express no view as to whether a successful innocent owner defense negates potentially responsible party status because it was not clearly erroneous for the district court to determine that Commander Oil was not innocent within the meaning of the statute. Certain semi-volatile organic compounds consistent with pollution from petroleum were found at the site under the tanks retained by Commander Oil and at least some testimony was presented at trial describing an oil spill from one of Commander Oil's trucks. Commander Oil is therefore a potentially responsible party and thus not entitled to pursue an indemnification claim.
 
 
 32
 Alternatively, Commander Oil argues that it is entitled to contractual indemnification from Barlo by virtue of their lease agreement. Commander Oil relies on those portions of the standard contract that require Barlo to prevent and abate nuisances connected with the property, and to repair the property. However, Commander Oil failed to raise the issue below in a timely manner and it is therefore waived for purposes of this appeal. In any event, indemnification provisions in contracts are to be strictly construed, see, e.g., Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 51 (2d Cir. 1993) (citing New York law), and we doubt whether Commander Oil and Barlo's generic lease agreement could have shifted to Barlo the kind of massive CERCLA liability at stake in this case.
 
 
 33
 Finally, so long as leave was properly given to Barlo to amend its answer, Commander Oil's remaining claims for negligence, nuisance, trespass, and waste were properly dismissed as time barred. Leave to amend shall be freely given, and this court reviews the district court's actions for abuse of discretion. See Block v. First Blood Assoc., 988 F.2d 344, 350 (2d Cir. 1993). Parties are generally allowed to amend their pleadings absent bad faith or prejudice. See State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981). Moreover, "it is rare for an appellate court to disturb a district court's discretionary decision to allow amendment." Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 235 (2d Cir. 1995). Commander Oil's claimed prejudice derives from the expenses incurred preparing to litigate its state-law claims. However, we see no reason to believe - and Commander Oil has not demonstrated - that these costs were in any way additional to the costs it necessarily incurred preparing its CERCLA claims. Even in the face of Barlo's seven-year delay to add its statute of limitations defense, we will not upset the district court's decision to permit Barlo to amend its answer accordingly, absent any showing of prejudice to Commander Oil or bad faith on the part of Barlo.
 
 CONCLUSION
 
 34
 For the reasons stated above, the judgment of the district court is REVERSED to the extent that it imposes CERCLA liability against Barlo. The judgment of the district court is AFFIRMED to the extent that it dismisses Commander Oil's indemnification and state-law claims.
 
 
 
 Notes:
 
 
 [1]
 Commander Oil cross-appeals from the judgment of the district court to the extent that it dismissed its claims for indemnification and certain state-law causes of action. In these respects, we affirm the judgment of the district court, as we discuss below.
 
 
 [2]
 As before the district court, the sole contested issue with respect to Barlo's liability under CERCLA is whether Barlo was an owner within the meaning of § 9607(a)(1). There is no dispute that Commander Oil has otherwise satisfied the requirements for establishing a claim under CERCLA. See Freeman v. Glaxo Wellcome, Inc., 189 F.3d 160, 163 (2d Cir. 1999) (enumerating the elements of a prima facie CERCLA claim).
 
 
 [3]
 Commander Oil urges us, if we disapprove of the district court's judgment, to remand the case for further proceedings to determine whether Barlo might be liable as an operator. We decline to do so. Although there are some unresolved factual issues that would bear on whether Barlo was an operator within the meaning of 42 U.S.C. § 9607(a)(1), under no version of those facts could Barlo be said to have "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Bestfoods, 524 U.S. at 66-67. Moreover, in light of our conclusion that Barlo is not liable as an owner under CERCLA, we need not - and do not - reach its arguments on appeal concerning the district court's apportionment of liability.